**IN THE UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF OHIO**

**Eastern Division**

**LIBERTARIAN PARTY OF OHIO, and
HAROLD THOMAS,**

        **Plaintiffs,**

**v.**                                               **Case No. 19-2501**

**DEGEE WILHEM, in his official capacity,**

        **Defendant,**

**HELEN E. BALCOLM, in her official capacity,**

        **Defendant,**

**OTTO BEATTY, III,  in his official capacity,**

        **Defendant,**

**DENNIS BROMMER, in his official capacity,**

        **Defendant,**

**D. MICHAEL CRITES, in his official capacity,**

        **Defendant,**

**CATHERINE A. CUNNINGHAM, in her official capacity,**

        **Defendant,**

**and**

**A. SCOTT NORMAN, in his official capacity,**

        **Defendant.**

**VERIFIED COMPLAINT
FOR DECLARATORY/INJUNCTIVE RELIEF**

Now come Plaintiffs, the Libertarian Party of Ohio and its Chair, Harold Thomas, (hereinafter "Plaintiff" or "Libertarian Party") by and through the undersigned, which hereby gives notice of their filing the following Verified Complaint for Declaratory and Injunctive relief against Defendants, Commissioners of Ohio's Elections Commission (collectively described hereinafter as the "Ohio Elections Commission" or "Commission"), in their official capacities, under 42 U.S.C. § 1983, *Ex parte Young*, 209 U.S. 123 (1908), and the First and Fourteenth Amendments to the United States Constitution.

This Action finds its genesis in a series of three debates coordinated, sponsored, planned and staged by the gubernatorial campaigns of Richard Cordray and Richard Michael ("Mike") DeWine, three non-profit corporations, the University of Dayton, Marietta College, and the City Club of Cleveland, and one public post-secondary educational institution in Ohio, Cleveland State University.   The planning began in the Summer of 2018 with the three debates taking place in the Autumn  of 2018 before the November election.

Only the gubernatorial candidates and campaigns of the Democratic and Republican Parties were involved in the coordination, planning, sponsoring and staging of the these three debates with the private and public entities listed above.  No gubernatorial candidates from the other two qualified political parties in Ohio, the Libertarian Party and the Green Party, were allowed to participate in any aspect of the planning, coordination, staging and sponsoring of the three debates, and neither the gubernatorial candidate for the Libertarian Party nor the gubernatorial candidate for the Green Party was invited to participate.  The private and public sponsoring entities listed above, moreover, failed to use pre-existing objective criteria to select who would participate in the three debates.

The three debates plainly violated Ohio law, as well as federal tax laws. Ohio, like the federal government through its campaign finance laws, bars corporations, both for-profit and non-profit, from coordinating, sponsoring, staging and holding exclusive, preferential debates for some candidates and not others. The only way a non-profit corporation may sponsor, coordinate, plan or stage candidates' debates is to do so on an egalitarian basis. In order to insure that candidates are afforded equal treatment, pre-existing objective criteria must be employed. Federal tax laws apply this same standard to non-profit corporations that enjoy tax-exempt status. All three of the non-profits, the University of Dayton, Marietta College, and the City Club of Cleveland, violated both Ohio's ban on corporate contributions found in Ohio's campaign finance laws and federal tax laws.

Plaintiff, the Libertarian Party, duly and timely filed complaints with Defendants (collectively the "Ohio Elections Commission"), the public agency charged with enforcing Ohio's campaign finance laws, including Ohio's ban on corporate contributions. The Ohio Elections Commission, by law, has six members who must also be members of the two major political parties. It is, by law, allowed one politically unaffiliated member. No other political parties may be represented. Consequently, it is dominated by the two major political parties.

The Ohio Elections Commission dismissed Plaintiff's complaints against the campaigns and the staging organizations that sponsored the three debates. It did so because it concluded that Ohio law allows corporations to sponsor, coordinate, stage and plan exclusive, preferential debates for the candidates of the two major political parties. Alternatively, the Ohio Elections Commission simply chose not to enforce Ohio law's clear ban on corporate contributions.

The Ohio Elections Commission is unconstitutionally constituted. By excluding members of political parties other than the two major political parties to serve on the

3

Commission, Ohio law violates the First and Fourteenth Amendments.  In the present case, the inherent political bias of the Ohio Elections Commission manifested itself in the summary dismissal of Plaintiff's complaints.  The Ohio Elections Commission's dismissals were motivated by political animus in violation of the First and Fourteenth Amendments.

## Jurisdiction

1.      This Court has original jurisdiction over Plaintiff's request for declaratory and injunctive relief seeking redress for violations of the First and Fourteenth Amendments to the United States Constitution under 42 U.S.C. § 1983 and 28 U.S.C. § 1331.

## Venue

2.      Venue is proper in this Court and in this Division under 28 U.S.C. § 1391(a) because Plaintiffs reside in and have a principal place of business is in Franklin County, Ohio, the Defendants' principal office and place of business is in Franklin County, Ohio, and a substantial part of the events and/or omissions giving rise to Plaintiff's claims arose in Franklin County.

## Parties, Persons and Entities Involved

3.      Plaintiff, the Libertarian Party of Ohio, was at all relevant times a recognized, ballot-qualified political party in Ohio during the 2018 general election and Plaintiff, Harold Thomas, is now and was at all relevant times the Chair of the Libertarian Party of Ohio with full authority to act in this matter on behalf of the Libertarian Party of Ohio.

4.      Defendants were and are Commissioners of Ohio's Elections Commission, which is charged with enforcing Ohio's campaign finance laws.

5.      Under Ohio law, the Ohio Elections Commission is composed of seven members, six of whom must be members of the two major political parties, and none of whom may be a member of any other qualified political party in Ohio.  *See* OHIO CAMPAIGN FINANCE HANDBOOK, CHAP.

14: OHIO ELECTIONS COMMISSION 14-3 ("The Ohio Elections Commission consists of seven persons, six of whom are appointed by the governor on the recommendation of the combined House and Senate caucuses of each of the major political parties. Three members must be appointed from each of two major political parties with the seventh member being an unaffiliated elector appointed by the other six members.") (emphasis added).

6.      Section 3517.152 of the Ohio Revised Code insures that six members of the seven-member Commission are members of the two major political parties in Ohio: "the speaker of the house of representatives and the leader in the senate of the political party of which the speaker is a member shall jointly submit to the governor a list of five persons who are affiliated with that political party.  … [T]he two legislative leaders in the two houses of the general assembly of the major political party of which the speaker is not a member shall jointly submit to the governor a list of five persons who are affiliated with the major political party of which the speaker is not a member. Not later than fifteen days after receiving each list, the governor shall appoint three persons from each list to the commission." (Emphasis added).

7.      Because of Ohio's major-political-party restriction, members of minor and new political parties, including the Libertarian Party of Ohio, are automatically and categorically ineligible to be members of the Ohio Elections Commission.

8.      Ohio's Elections Commission is an agency of the State of Ohio  that is "empowered to hear alleged violations of campaign finance law contained in Revised Code sections 3517.08-3517.13, 3517.17, 3517.18, 3517.20-3517.22, 3599.03 and 3599.031." OHIO CAMPAIGN FINANCE HANDBOOK, CHAP. 14: OHIO ELECTIONS COMMISSION 14-3.

9.     Ohio's Elections Commission is authorized by Ohio law to find violations of § 3599.03 of the Ohio Revised Code, assess fines, and refer those who violate  § 3599.03 of the Ohio Revised Code for criminal prosecution.  *See* O.A.C. 3517-1-14(B)(3); O.A.C. § 3517-1-14(C)(2)(a).

10.     Defendants, Degee Wilhlem, Helen E. Balcolm, Otto Beatty, III, Dennis Brommer, D. Michael Crites, Catherine A. Cunningham, and A. Scott Norman, are Commissioners of the Ohio Elections Commission who at all times relevant to this action were acting under color of Ohio law while engaged in state action.

11.      Defendants, Degee Wilhelm, Helen E. Balcolm, Otto Beatty, III, Dennis Brommer, D. Michael Crites, Catherine A. Cunningham, and A. Scott Norman, are sued in their official capacities as the Commissioners of the Ohio Elections Commission responsible for dismissing Plaintiff's administrative complaint described below.

12.     Defendants, as Commissioners of Ohio's Elections Commission sued in their official capacities, are proper Defendants in this action seeking declaratory and injunctive relief.

13.     The Libertarian Party of Ohio remains a qualified political party in Ohio and has nominated candidates for the 2019 general election in Ohio.

14.     The Libertarian Party of Ohio's candidate for Governor of Ohio in 2018 was Travis Irvine.

15.     The Libertarian Party of Ohio's candidate for Lieutenant Governor of Ohio in 2018 was Todd Grayson.

16.     The Libertarian Party of Ohio nominated and ran several other candidates for various state and federal offices in Ohio during the 2018 general election.

17.     Richard Cordray was the Democratic candidate for Governor of Ohio in 2018, and his election campaign was known as Cordray/Sutton for Ohio.

18. Richard Michael ("Mike") DeWine was the Republican candidate for Governor of Ohio in 2018, and his election campaign was known as DeWine/Husted for Ohio.

19. The City Club of Cleveland was in 2018 and remains a non-profit corporation registered with the State of Ohio that conducts its principal activities in Cleveland, Ohio.

20. The City Club of Cleveland was and is subject to the jurisdiction of the Ohio Elections Commission.

21. The City Club of Cleveland at all relevant times in 2018 did business as a non-corporate entity called the Ohio Debate Commission, "a collaboration of civic organizations, media organizations, and universities" that stages exclusive debates in Ohio between the two major political parties' candidates. *See* Ohio Debate Commission, https://ohiodebatecommission.org/ (last visited September 15, 2018).

22. The City Club's Ohio Debate Commission publicly represented itself in 2018 as "a project of the City Club of Cleveland … [that] was initially funded through a seed grant from the George Gund Foundation, and in-kind contributions from the City Club of Cleveland, the Columbus Foundation and the Columbus Metropolitan Club." *Id.*

23. The City Club of Cleveland and the Ohio Debate Commission were and are alter egos, with the latter acting as a conduit for staging exclusive debates between the two major parties' candidates in Ohio.

24. Marietta College was in 2018 and remains a non-profit post-secondary educational institution located in Marietta, Ohio that is registered with the State of Ohio as a non-profit corporation.

25. Marietta College was in 2018 and remains subject to the jurisdiction of the Ohio Elections Commission.

26. The University of Dayton was in 2018 and remains a non-profit post-secondary educational institution located in Dayton, Ohio that is registered with the State of Ohio as a non-profit corporation.

27. The University of Dayton was in 2018 and remains subject to the jurisdiction of the Ohio Elections Commission.

28. Cleveland State University was in 2018 and remains a publicly funded post-secondary educational institution that is not subject to the jurisdiction of the Ohio Elections Commission.

## The First Debate at the University of Dayton

29. Sometime between July 2018 and September 6, 2018, the election campaigns for Richard Cordray and Mike DeWine approached the University of Dayton and asked it to stage an exclusive gubernatorial debate between Cordray and DeWine.

30. The University of Dayton agreed to host the debate between Cordray and DeWine and agreed to hold it on the University of Dayton's campus on September 19, 2018.

31. No other qualified gubernatorial candidate, including Plaintiff's gubernatorial candidate Travis Irvine, was made aware of the discussions and/or plans between the University of Dayton and the Cordray and DeWine campaigns to hold a gubernatorial debate.

32. No other qualified gubernatorial candidate, including Plaintiff's gubernatorial candidate Travis Irvine, was invited to participate in the debate by either the Cordray Campaign, the DeWine Campaign, the University of Dayton, or anyone associated with those organizations or the debate.

33. No pre-existing objective criteria were published, documented, or in any way made available to the public, the press, or the remaining qualified gubernatorial candidates by the

8

University of Dayton, the DeWine Campaign, the Cordray Campaign or anyone associated with those organizations or the debate.

34.     No person or entity outside the University of Dayton, Cordray Campaign, and DeWine Campaign were advised of any pre-existing objective criteria for selection of the participants to be invited to the Dayton debate.

35.     On or about September 7, 2018, the Cordray and DeWine Campaigns publicly announced that they had agreed to participate in a series of three gubernatorial debates in Ohio, the first being the debate to be held at the University of Dayton on September 19, 2018, the second to be held at Marietta College on October 1, 2018, and the third to be held on the campus of Cleveland State University on October 8, 2018.  *See* Jessie Balmert, Ohio's governor race: Cordray, DeWine set 3 debates across state, Sept. 7, 2018, CINCINNATI ENQUIRER, https://www.cincinnati.com/story/news/politics/elections/2018/09/07/ohio-governors-race-cordray-dewine-set-3-debates-across-state/1221354002/ (last visited September 15, 2018).

36.     On September 7, 2018, UD News, the University of Dayton's official press agency, reported:

> The University of Dayton will sponsor and host and Cox Media Group Ohio will present the first gubernatorial debate between Republican nominee Mike DeWine and Democratic nominee Richard Cordray at 7 p.m. Wednesday, Sept. 19, at Daniel J. Curran Place on the University of Dayton River Campus.
>
> …
> The nearly 1-hour debate will be available to air on TV and radio stations statewide and Cox Media Group Ohio online and social media platforms, http://www.whiotv.com, http://www.daytondailynews.com and Facebook live on the Dayton Daily News, WHIO-TV and WHIO Radio Facebook pages.
> …
>
> This will be the first of three debates between the candidates. They will debate again Oct. 1 at Marietta College and Oct. 8 at Cleveland State University.

UD NEWS, UD to Host First Gubernatorial Debate, Sept. 7, 2018 (https://udayton.edu/news/articles/2018/09/gubernatorial_debate.php) (last visited September 18, 2018).

37.     The Cordray and DeWine Campaigns' common objective, pursued with and through the University of Dayton, was to arrange an exclusive debate between only Cordray and DeWine without notifying or inviting any other qualified candidate to participate in the debate.

38.     No mention was made before September 12, 2018 in any press release that the University of Dayton's debate had used or would use pre-existing objective criteria to select the participants in its debate; rather, the University of Dayton's sole criteria for selecting the candidates to participate in the debate was that the participants be Cordray and DeWine, the candidates of the Republican and Democratic Parties.

39.     Plaintiff on September 11, 2018 sent demand letters via certified United States mail and e-mail to the University of Dayton, the Cordray Campaign, and the DeWine Campaign, explaining that the planned Dayton debate excluded the Libertarian Party of Ohio gubernatorial candidate and was in violation of Ohio law and federal tax laws.

40.     On September 12, 2018, the day after it received Plaintiff's demand letter, the University of Dayton publicly announced that it had in fact used a 10% polling formula to select the candidates for its debates.  *See* Laura A. Bischoff, Dayton to host first governor debate at UD, Sept. 12, 2018, DAYTON DAILY NEWS, https://www.daytondailynews.com/news/dayton-host-first-governor-debate/Bj8Eh0MTiLVYc2OyAyqNQI/ (last visited, Sept. 15, 2018).

41.     The University of Dayton's claim that it had used a 10% polling formula to select the candidates for its debate was not and could not have been true, since no relevant polling had taken place by the time the exclusive debate was announced on September 7, 2018.

42.     The University of Dayton's debate was staged according to its plan on September 19, 2018 on the University of Dayton's campus before a live audience with live and delayed broadcast coverage supplied by Cox Media Group Ohio through WHIO-TV, WHIO-Radio and the Dayton Daily News, and without Plaintiff' gubernatorial candidate or the Green Party's gubernatorial candidate being invited or allowed to participate.

## The Second Debate at Marietta College

43.     The election campaigns for Richard Cordray and Mike DeWine were placed in contact with Marietta College sometime before September 6, 2018 and as a result of this contact obtained an agreement from Marietta College to stage an exclusive debate between Cordray and DeWine, the two major parties' candidates for Governor of Ohio in 2018, on the Marietta College campus.

44.     Marietta College sometime before September 6, 2018 agreed to host an exclusive debate between Cordray and DeWine and further agreed to hold the debate on the Marietta College campus on October 1, 2018.

45.     No other qualified gubernatorial candidate and no other qualified political party in Ohio was made aware of the discussions and negotiations between Marietta College and the Cordray and DeWine campaigns to stage the exclusive debate scheduled for October 1, 2018.

46.     No other qualified gubernatorial candidate, including Plaintiff's qualified gubernatorial candidate, was invited to participate in the Marietta College debate by either the Cordray Campaign, the DeWine Campaign, Marietta College or anyone else.

47.     No pre-existing objective criteria were employed to select the participants in the Marietta College debate and no pre-existing objective criteria were published, documented, or in any way

11

made available to the public, the press, or the two remaining qualified gubernatorial candidates by the Cordray Campaign, the DeWine Campaign, Marietta College, or anyone else.

48. No person or entity outside Marietta College, the Cordray Campaign, and the DeWine Campaign was advised of any pre-existing objective criteria being employed to select the participants to be invited to the Marietta College debate.

49. The Cordray and DeWine campaigns aided and abetted Marietta College's staging of the exclusive gubernatorial debate between Cordray and DeWine scheduled to be held on the Marietta College campus on October 1, 2018.

50. Marietta College's exclusive gubernatorial debate between Cordray and DeWine was held on October 1, 2018 as planned without the participation of any other qualified gubernatorial candidate, including Plaintiff's qualified gubernatorial candidate.

51. The two major-party participants invited to participate in the Marietta College debate were selected solely on the basis of their being the gubernatorial candidates for the Democratic and Republican parties.

### The Third Debate at Cleveland State University

52. The election campaigns for Richard Cordray and Mike DeWine were placed in contact with the City Club of Cleveland, d/b/a the Ohio Debate Commission, sometime before September 6, 2018, and as a result of this contact obtained an agreement from the City Club of Cleveland, d/b/a the Ohio Debate Commission, to stage an exclusive debate between Cordray and DeWine in Cleveland, Ohio.

53. The City Club of Cleveland, through its alter ego the Ohio Debate Commission, ultimately agreed to stage the exclusive debate between Cordray and DeWine on October 8, 2018 on the Cleveland State University campus.

12

54. Cleveland State University sometime before September 6, 2018 agreed with the City Club of Cleveland, d/b/a the Ohio Debate Commission, to hold the exclusive debate between Cordray and DeWine on October 8, 2018 on its campus in Cleveland.

55. No other qualified gubernatorial candidate and no other qualified political party in Ohio was made aware of the discussions between the City Club of Cleveland, the Ohio Debate Commission, the Cordray campaign, the DeWine campaign, and Cleveland State University before the debates were finalized, the two participants selected, and the date and location were publicly announced.

56. No other qualified gubernatorial candidate, including Plaintiff's candidate, was invited to participate in the debate scheduled to be held on the Cleveland State University campus by either the Cordray Campaign, the DeWine Campaign, the City Club of Cleveland, the Ohio Debate Commission, Cleveland State University, or anyone else.

57. No pre-existing objective criteria were employed to select the participants for the Cleveland debate and none were published, documented, or in any way made available to the public, the press, or the remaining qualified gubernatorial candidates at any time before or after the Cleveland debate held on October 8, 2018.

58. No person or entity outside the City Club of Cleveland, the Ohio Debate Commission, the Cordray Campaign, the DeWine Campaign, and Cleveland State University were advised or notified of any pre-existing objective criteria that were employed to select the participants to be invited to the debate scheduled to be held on the Cleveland State University campus on October 8, 2018.

59. The City Club of Cleveland, the Ohio Debate Commission, and Cleveland State University expressly agreed between themselves and with the Cordray and DeWine campaigns to

restrict the Cleveland debate to the candidates of the two major political parties, that is, Cordray and DeWine.

60.     "The [Ohio Debate] Commission," according to its publicly available web page, "aims to oversee political debates for the highest offices in Ohio to ensure their quality and fairness." *See* Ohio Debate Commission, https://ohiodebatecommission.org/ (last visited September 15, 2018).

61.     The Ohio Debate Commission expressly stated on its publicly available web page before the debate that the debates it sponsors and stages are restricted to "candidates of major political parties." *Id*.

62.     On September 7, 2018, following the campaigns' joint public announcement of the planned debates, Marietta College publicly announced that it was staging and hosting its exclusive debate between Cordray and DeWine:

> Marietta College will sponsor and host the second of three Ohio gubernatorial debates between Republican nominee Mike DeWine and Democratic nominee Richard Cordray at 7 p.m. Monday, Oct. 1, at Ban Johnson Arena.

> DeWine, the state's attorney general, and Cordray, the former director of the Consumer Financial Protection Bureau, are both aiming to succeed term-limited GOP Gov. John Kasich.

> The Marietta debate will be conducted in an audience participation "Town Hall" format. The event is invitation-only and no public tickets will be available.

> "We are pleased and excited to be selected to host one of the three gubernatorial debates and provide a venue to show how our country's democratic system works," said Marietta College President William N. Ruud. "Marietta College is also proud to represent all of Southeast Ohio as our two candidates familiarize themselves with this part of the state as they discuss issues that are important to the entire great state of Ohio."

> The nearly 1-hour debate will be available to air on TV and radio stations statewide. Check your local listings for the stations in your area broadcasting the debate. Debate moderators and panelists will be announced at a later date.

*See* https://www.marietta.edu/article/gubernatorial-debate-2018 (last visited September 29, 2018).

14

63. On September 10, 2018, the City Club of Cleveland, through its Ohio Debate Commission and in conjunction with Cleveland State University, officially announced that it would stage an exclusive debate between Cordray and DeWine -- which it identified as "the major party candidates for Governor of the State" -- on October 8, 2018 on the Cleveland State University campus:

> The Ohio Debate Commission will host a debate between the major party candidates for Governor of the State of Ohio at 7 p.m., October 8 on the campus of Cleveland State University. Mike DeWine, the state's attorney general, and Richard Cordray, the former director of the Consumer Financial Protection Bureau will have the opportunity to present their plans for the future direction of our state to Ohio's voters in preparation for the general election in November.

> "We're honored to partner with the Ohio Debate Commission on this important event," said Cleveland State University President Harlan Sands. "A strong Cleveland and a strong Ohio depend on our future leaders having a commitment to civic engagement. Bringing our students an opportunity to engage with the candidates vying for the top office in the state is exactly the kind of work we should be doing at the university."

> "We helped to pull this debate commission together because we believe that better debates can help create the conditions for better elections," said Dan Moulthrop, CEO of The City Club of Cleveland and a member of the Ohio Debate Commission. "With the network created by the members of this commission, we'll be able to make sure everyone in every corner and community of the state has the opportunity to take full measure of both candidates before the November election."

> The Ohio Debate Commission is a collaboration of civic organizations, media organizations, and universities working to create debates of the highest quality for the highest statewide offices and distributing that content to every corner of the state. The commission was founded in early 2018 and includes media entities in every market in Ohio. More information can be found at ohiodebatecommission.org.

*See* https://www.csuohio.edu/news/cleveland-state-university-host-gubernatorial-debate-oct-8 (last visited October 2, 2018).

64. Dan Moulthrop, who is mentioned in the Ohio Debate Commission announcement described above, is the chief executive officer of the City Club of Cleveland and an authorized agent of the Ohio Debate Commission.

**Plaintiff's Demand Letters**

64.    Plaintiff, through counsel, on September 11, 2018 after learning of the series of three exclusive debates publicly announced between September 7, 2018 and September 10, 2018 by the campaigns and staging organizations, delivered demand letters via certified United States Mail and e-mail to the University of Dayton, Marietta College, the City Club of Cleveland, the Cordray Campaign, and the DeWine Campaign, explaining that the planned debates had illegally excluded Plaintiff's gubernatorial candidate.

65.    The University of Dayton on September 14, 2018 sent to Plaintiff's attorney a letter written by S. Ted Bucaro, Executive Director of Government and Regional Relations at the University of Dayton, rejecting Plaintiff's demand that its candidate be invited to the debate without mentioning any objective criteria or providing any reason for excluding Plaintiff's candidate from the debate.

66.    Plaintiff, through counsel, on September 15, 2018 responded to Bucaro's letter by inviting a more elaborate explanation from the University of Dayton.

67.    Plaintiff, through counsel, on September 15, 2018 sent an e-mail to Bruce Biel, general counsel at the University of Dayton, inviting Mr. Biel to contact Plaintiff's attorney to discuss the debate.

68.    Following an exchange of phone messages between Plaintiff's attorney and Beil, Beil on September 20, 2018 was once again invited by Plaintiff's attorney in a phone conversation to produce any documentation or other proof the University of Dayton possessed showing that the University of Dayton employed polling data or any other pre-existing objective criteria to select the participants invited to the Dayton debate.

69. Neither Beil nor anyone else acting for the University of Dayton ever produced any documentation or proof supporting the University of Dayton's belated September 12, 2018 claim that it used polling data or any other kind of pre-existing objective criteria to select the participants invited to the Dayton debate.

70. Neither the Cordray Campaign nor the DeWine Campaign responded to Plaintiff's letters and inquiries in order to offer any explanation for why they were participating in what they knew to be an illegal debate.

71. Following receipt of Plaintiff's demand letter, Dan Moulthrop, CEO of the City Club of Cleveland and authorized agent of the Ohio Debate Commission, on September 13, 2018 directly contacted Travis Irvine, Plaintiff's gubernatorial candidate, and offered to stage a "separate forum" for the two minor-party gubernatorial candidates at the City Club of Cleveland on an unspecified date.

72. In his e-mail to Irvine on that day, September 13, 2018, Moulthrop explained not only the separate forum, but also stated that the City Club of Cleveland and the Ohio Debate Commission would also ensure that the minor- party gubernatorial candidates were mentioned by name by the moderator of the debate between Cordray and DeWine on October 8, 2018:

> Here's what we can do. There will be a statement read by the moderator at the opening of the televised program, explaining that there are a total of four candidates in the race. Both Ms. Gadell-Netwon and Mr. Irvine will be mentioned by name and party affiliation. The moderator will also explain that a separate forum sponsored by the ODC will be or has been held and can be viewed on the ODC website and the websites of our many partners. There will be no photos shown on television.

> Regarding the potential reach of our forum, the ODC is brand new and has no content to tell you about yet. This forum will be carried on the websites of all of the partners of the ODC (https://ohiodebatecommission.org/about/), which include all the major news organizations in the state of Ohio. I don't know how that will compare to the Jimmy Dore show, whose numbers seem substantial.

(Emphasis added).

17

73.     Following Moulthrop's direct correspondence with the Irvine Campaign and the Green Party's gubernatorial candidate about the Ohio Debate Commission's "separate" minor-party forum, attorneys for Plaintiff contacted Moulthrop to explain Plaintiff's refusal to participate in any separate forum or debate, whether deemed a minor-party forum, debate or luncheon.

74.     In an e-mail dated September 15, 2018 to Plaintiff's attorneys, Moulthrop identified the Ohio Debate Commission's proposed separate forum as a "luncheon" and "conversation" to be held at the City Club of Cleveland:

> The forum would be a luncheon event, hosted at The City Club and sponsored in part by the Ohio Debate Commission. The candidates should expect to be here from 11:45 to 1:45. The official program goes from 12:30-1:30. This would be a moderated conversation with both candidates.
>
> This event would be produced with our partners at ideastream, producing broadcast quality digital content, shared live and archived on the websites of all of the ODC partners, which, as you know, include all the major media entities in the state, as well as the Columbus Metropolitan Club and the Ohio League of Women voters.
>
> We would anticipate the partners promoting this content through their social media channels, as well.  At the beginning of our major party debate at Cleveland State, the moderator will read a statement read explaining that there are a total of four candidates in the race. Both Ms. Gadell-Netwon and Mr. Irvine will be mentioned by name and party affiliation. The moderator will also explain that a separate forum sponsored by the ODC will be or has been held and can be viewed on the ODC website and the websites of our many partners.
>
> Here are the possible dates for our forum with the LPO and Green Party: October 2, 25, or 29. October 8 had been a possible date, but it is no longer available. Our preference would be for the earliest date, but we are flexible.

(Emphasis added).

75.     In his e-mail dated September 15, 2018 to Plaintiff's attorneys, Moulthrop reiterated that the City Club of Cleveland's October 8, 2018 debate on the Cleveland State University campus was a "major party debate" sponsored by the Ohio Debate Commission.

76.     Moulthrop's September 15, 2018 e-mail to Plaintiff's attorneys conceded that the two minor parties' candidates harbored sufficient support among Ohio's voters to warrant a forum sponsored by the Ohio Debate Commission.

77.     Moulthrop repeatedly stated in his many e-mails to the Irvine Campaign and to Plaintiff's attorneys that the Cleveland State University debate was only for the two major-party candidates and that the "separate forum" he proposed would be a substitute provided to the two minor-party candidates.

78.     Plaintiff and the Irvine Campaign, through counsel, in a series of e-mails culminating in an e-mail sent on September 27, 2018 to Moulthrop and his attorney, Jill Zimon, rejected Moulthrop's proposed separate forum for minor-party gubernatorial candidates:

> My clients have already last week rejected the offer you sent out again yesterday -- the "alternative lunch forum" offer -- but let me once again on behalf of my clients reject it as a solution to my client's demand. It is not an acceptable solution.
>
> The City Club of Cleveland is in a precarious situation. It has admitted that it merely selected the two major party candidates to participate in a debate that it is staging on the Cleveland State University campus. It has admitted that it knowingly ignored the other two qualified candidates. They were not consulted, they were not notified, and there was absolutely nothing they could do to qualify for your debate.
>
> Let there be no mistake about it. City Club's debate will violate Ohio's ban on corporate contributions, the Internal Revenue Code's restrictions on non-profit (i.e., City Club) political activities, and Ohio's identical tax limitation on non-profits. Meanwhile, the City Club's partner, Cleveland State University, will not only risk its charitable status under the Internal Revenue Code, it will also violate O.R.C. 9.03 (which prohibits public entities from supporting candidates for office) and the First Amendment (which prohibits public fora from preferring one political party over another when selecting candidates for debates). Your preferred candidates, meanwhile, risk referral to the Franklin County Prosecutor and criminal prosecution for accepting corporate contributions. The Libertarian Party is forward-looking, so don't believe for a minute that this will go away after the debate and after the election.
>
> I offer on behalf of my clients to the City Club the following; don't violate these laws and my clients will gladly participate in whatever events the City Club would like to plan. This requires inviting Travis Irvine to the Cleveland State University debate as an equal

participant. My clients will accept no less. They definitely will not participate in illegalities as accomplices. It is that simple.

79.     The City Club of Cleveland and Ohio Debate Commission repeatedly refused to invite Plaintiff's gubernatorial candidate to its October 8, 2018 "major party" debate because he was not a candidate representing either major party.

80.     The City Club of Cleveland's and Ohio Debate Commission's October 8, 2018 debate on the Cleveland State University campus was held as planned and included media coverage provided by Ideastream, a participating organization that is affiliated with the Ohio Debate Commission.

81.     Plaintiff, through counsel, notified Ideastream by letter dated September 17, 2018, that the City Club of Cleveland's and Ohio Debate Commission's exclusive debate between Cordray and DeWine violated state and federal law.

82.     Plaintiff, through counsel, on September 24, 2018 followed up its demand letter previously sent to Marietta College with an e-mail reiterating its demand and asking Marietta College to contact the Libertarian Party of Ohio through its attorneys.

83.     NBC4/WCMH Media Group, a participating organization that is affiliated with the Ohio Debate Commission, agreed to broadcast the Marietta College debate and did in fact broadcast that debate.

84.     Plaintiff on September 26, 2018 forwarded to NBC4/WCMH Media Group a copy of the demand letter it had sent to Marietta College on September 11, 2018.

85.     Marietta College did not respond to Plaintiff's demands and/or inquiries in any way.

86.     Neither the Cordray Campaign nor the DeWine Campaign responded to Plaintiff's demand letters.

20

87.    On September 26, 2018, the City Club of Cleveland formally announced the separate

forum it had offered as an alternative to the minor parties:

> The Ohio Debate Commission will host a forum for all gubernatorial candidates on the ballot. All candidates on the ballot have been invited including Democrat Richard Cordray, Republican Attorney General Mike DeWine, and Libertarian Travis Irvine, as well as Green Party candidate Constance Gadell-Newton, who has accepted this invitation. The forum will be held Monday, October 15 at The City Club of Cleveland. Doors open at noon. The program begins at 12:30. The forum is an opportunity for candidates to present their plans for the future direction of our state to Ohio's voters in preparation for the general election in November. Consistent with City Club tradition, there will be a question and answer period.

> "We helped pull this debate commission together because we want to provide voters across the state with as much information as possible so they're prepared to cast their ballot," said Dan Moulthrop, CEO of The City Club of Cleveland, a member of the Ohio Debate Commission. "With the network created by the members of the Commission, we'll be able to make sure everyone in every corner and community of the state has the opportunity to take full measure before the November election."

> Digital production of the forum will be done by ideastream. Commission members have been encouraged to carry the livestream of the event on their web sites, bringing the content to communities across the state and also to cover the gubernatorial forum for news purposes.

> The Ohio Debate Commission is a collaboration of civic organizations, media organizations, and universities working to create debates of the highest quality for the highest statewide offices and distributing that content to every corner of the state. The commission was founded in early 2018 and includes media entities in every market in Ohio. Following this first cycle, it expects to evolve, in consultation with its partners and many others, in a way that continues to foster fair and substantive debates, encourages participation in democracy and develops criteria that would not operate as a blanket policy categorically excluding minor party candidates from Commission sponsored debates.

88.    In this announcement, Moulthrop, the City Club of Cleveland, and the Ohio Debate

Commission admitted that the Ohio Debate Commission's existing criteria "operate as a blanket

policy categorically excluding minor party candidates from Commission sponsored debates."

89. Neither the DeWine Campaign nor the Cordray Campaign accepted the Ohio Debate Commission's September 26, 2018 invitation to participate in the proposed alternative minor-party forum.

90. Plaintiff, as it had done previously, once again rejected the Ohio Debate Commission's proposed separate minor-party forum following its formal announcement on September 26, 2018.

91. As Plaintiff's attorneys explained to Moulthrop and Zimon, the City Club of Cleveland's/Ohio Debate Commission's separate forum itself violated Ohio's ban on corporate aid to candidates and political parties because it was engineered as, and intended to be staged as, a separate, substitute non-major-party candidate forum or debate.

### Candidates Excluded from Planning and Participation

92. Neither Plaintiff's candidate for Governor nor Plaintiff was consulted or notified about the planning and staging of any of the three debates planned by the Cordray and DeWine Campaigns with the University of Dayton, Marietta College, and the City Club of Cleveland before or after the debates' public announcement by the Campaigns on September 7, 2018.

93. Plaintiff's candidate for Governor was not invited to participate in any of these three debates, including the debates staged by the University of Dayton on September 19, 2018, the City Club of Cleveland on October 8, 2018 and Marietta College on October 1, 2018.

94. Had Plaintiff's candidate for Governor been invited to any of these three debates, he would have participated in any and all of the debates to which he was invited or otherwise allowed to participate, including the debate staged by the University of Dayton on September 19, 2018, the debates staged by the City Club of Cleveland on October 8, 2018, and the debate staged by Marietta College on October 1, 2018.

22

95. Neither the University of Dayton, Marietta College, the DeWine Campaign, the Cordray Campaign, the City Club of Cleveland, nor the Ohio Debate Commission notified Plaintiff or its gubernatorial candidate of any pre-existing objective criteria that were to be used to select the participants to be included in the Marietta College debate or the Cleveland State University debate, notwithstanding having been provided numerous opportunities to do so.

**Lack of Polling Before the Announcement
of the Debates**

96. When the debates were announced on September 7, 2018, there had yet to be any polling in Ohio asking voters whether they preferred Cordray (Democrat), DeWine (Republican), Irvine (Libertarian), or Gadell-Newton (Green) for Governor.

97. Because there was no relevant polling available as to voters' preferences between Cordray (Democrat), DeWine (Republican), Irvine (Libertarian), and Gadell-Newton (Green), polling data could not have been used by the University of Dayton, Marietta College, the City Club of Cleveland, the City Club's Ohio Debate Commission, the Cordray Campaign, the DeWine Campaign, or any other person or entity to select debate participants before the three debates were finalized and announced on September 7, 2018.

98. Polling measuring voters' preferences between Cordray (Democrat), DeWine (Republican), Irvine (Libertarian), and Gadell-Newton (Green) was not conducted in Ohio or elsewhere until after the debates set for the University of Dayton, Marietta College, and Cleveland State University had already been finalized as exclusive debates.

**Violations of Ohio Law By the Major-Party Candidates, Their Campaigns
and the Staging Organizations**

99. Ohio law categorically bars non-profit corporations from making contributions to candidates for public office. *See* Ohio Revised Code § 3599.03(A)(1); O.R.C. § 3517.082.

23

100. Ohio's law prohibiting corporations from making contributions extends to non-profit as well as for-profit corporations, and extends to in-kind contributions and "anything of value" that is given to candidates. *See* OHIO SECRETARY OF STATE, OHIO CAMPAIGN FINANCE HANDBOOK, CHAPTER 9: BUSINESSES AND LABOR ORGANIZATIONS at 9-3 (2018).[1]

101. Staging a debate for political candidates causes an in-kind contribution to be made and constitutes "anything of value" within the meaning of federal law and Ohio's prohibition on corporate contributions. *See Natural Law Party of the United States of America v. Federal Election Commission*, 111 F. Supp.2d 33, 36 (D.D.C. 2000).

102. The debates staged and sponsored by the University of Dayton, the City Club of Cleveland, the Ohio Debate Commission, and Marietta College constituted illegal corporate contributions to Mike DeWine, the DeWine Campaign, Richard Cordray and the Cordray Campaign.

103. The Cordray and DeWine Campaigns solicited, aided and abetted the University of Dayton, the City Club of Cleveland, the Ohio Debate Commission, Cleveland State University, and Marietta College to stage the debates between Cordray and DeWine in violation of Ohio's ban on corporate campaign contributions located in O.R.C. § 3599.03.

104. The Cordray and DeWine campaigns aided and abetted the University of Dayton, the City Club of Cleveland, the Ohio Debate Commission, and Marietta College in staging the exclusive gubernatorial debates scheduled to be held in Marietta on October 1, 2018 and Cleveland on October 8, 2018.

105. The Cordray and DeWine Campaigns' common objective, pursued with the University of Dayton, the Ohio Debate Commission, the City Club of Cleveland, Marietta College, and Cleveland State University was to arrange exclusive debates between only Cordray and DeWine.

---

[1] https://www.sos.state.oh.us/globalassets/candidates/cfguide/chapters/chapter9.pdf).

106. "For over a century, the provisions of this section [O.R.C. § 3599.03] of Ohio law prohibited corporations from participating in the partisan electoral process by or on behalf of a candidate except through a corporate sponsored political action committee." Ohio Elections Commission Opinion 2010ELC-02, at 1 (September 2, 2010).

107. In 1997, the Ohio Elections Commission advised that "the use of a [corporate] logo on an endorsement letter is considered to be a corporate contribution in violation of R.C. § 3599.03." Ohio Elections Commission Opinion 97ELC-05.

108. The Ohio Elections Commission reiterated the conclusion that any form of corporate support for candidates or parties constituted impermissible aid in 2015:

> The prohibitions in R.C. § 3599.03 … are against the use of any of the corporation's property. The property of a corporation encompasses not only its cash on hand, but also its products, its physical property such as plant and equipment, and, in the case at issue in this opinion request, its intellectual property and goodwill such as service marks, trademarks and logos.

Ohio Elections Commission Opinion 2015ELC-01, at 2 (July 23, 2015) (quoting 97ELC-05).

109. Ohio's ban on corporate aid through contributions and expenditures to candidates, their campaigns and political parties mirrors the precise same ban found in federal campaign finance laws.

110. The Ohio Elections Commission has consistently analogized Ohio's ban on corporate aid to candidates to the federal ban on corporate contributions/expenditures; as recently as 2010 the Commission stated that "because Ohio law is sufficiently similar to the federal prohibition [on electioneering communications] at issue in *Citizens United* [*v. Federal Elections Commission*, 558 U.S. 310 (2010)], a review of the statute [O.R.C. § 359.03] and the Commission's application of it is appropriate." Ohio Elections Commission Opinion, 2010ELC-02, at 1.

111. Because Ohio's campaign finance law is "modeled after a provision of the Federal

Election Campaign Act of 1971 ('FECA') requiring *both* corporations and labor unions to use separate segregated funds to finance independent expenditures made in federal election campaigns," *Toledo Area AFL-CIO Council v. Pizza*, 898 F. Supp. 554, 560 (N.D. Ohio 1995), interpretations of federal campaign finance rules are instructive if not controlling.

112.    Under the analogous federal law banning corporate campaign contributions, corporate expenditures may only be used to defray the costs of staging and supporting candidate debates where those debates are held by nonpartisan organizations and meet the criteria found in 11 C.F.R. § 110.13.

113.    Section 110.13 states that debate staging organizations must either be nonprofit organizations that "do not endorse, support, or oppose political candidates or political parties," or broadcasters that are "not owned or controlled by a political party, political committee or candidate." 11 C.F.R. § 110.13(a).

114.    Section 110.13 states that debates must include at least two candidates and not be structured "to promote or advance one candidate over another." 11 C.F.R. § 110.13(b).

115.    Section 110.13 states that debate staging organizations are required to use "pre-established objective criteria to determine which candidates may participate in the debate …." 11 C.F.R. § 110.13(c) (emphasis added).

116.    Section 110.13 states that "[f]or general election debates, staging organizations(s) shall not use nomination by a particular political party as the sole objective criterion to determine whether to include a candidate in a debate." *Id.* (emphasis added).

117.    Courts interpreting § 110.13 have ruled that "[s]taging organizations must be able to show that their objective criteria were used to pick the participants, and that the criteria were not designed to result in the selection of certain pre-chosen participants." *Buchanan v. Federal*

*Election Commission,* 112 F. Supp.2d 58, 74 (D.D.C. 2000) (quoting FEC statement) (emphasis added).

118. Courts interpreting § 110.13 have ruled that "[t]aken together, these statements by the regulation's drafters strongly suggest that the objectivity requirement precludes debate sponsors from selecting a level of support so high that only the Democratic and Republican nominees could reasonably achieve it." *Buchanan v. Federal Election Commission,* 112 F. Supp.2d at 74.

119. Courts interpreting § 110.13 have ruled that staging organizations cannot simply select the two major-party candidates for inclusion in debates. *See La Botz v. Federal Election Commission*, 889 F. Supp.2d 51 (D.D.C. 2012).

120. Courts interpreting § 110.13 have ruled that staging organizations cannot employ criteria that are impossible for new and/or minor parties to meet. *See La Botz v. Federal Election Commission*, 889 F. Supp.2d 51 (D.D.C. 2012).

121. Federal courts interpreting § 110.13 have rejected criteria as acceptable for debate qualification when those criteria are developed and employed after the actual selection of participants has been made. *See La Botz v. Federal Election Commission*, 889 F. Supp.2d 51 (D.D.C. 2012).

122. Section 110.13 offers a safe harbor to corporations to insure that corporate aid is offered neutrally, fairly and equally to all qualified candidates for a particular office as opposed to one or some preferred candidates.

123. Corporations that stage or sponsor debates and that do not satisfy this safe harbor automatically violate Congress's ban on corporate contributions to candidates. *See La Botz v. Federal Election Commission*, 889 F. Supp.2d 51 (D.D.C. 2012).

124. In 2002, in an effort to more fully police the federal ban on corporate support for

27

candidates and political parties, Congress enacted the Bipartisan Campaign Reform Act (BCRA) of 2002.

125. The BCRA was designed to close a loop-hole that had developed in the federal ban on corporate activity in federal elections.

126. Under both federal law and Ohio law as they existed in 2001, corporations were precluded from using their resources to influence federal elections.

127. Because corporations were allowed to engage in so-called "issue-advertising" before adoption of the BCRA, advertising which did not identify or target particular candidates, corporations could effectively enter the marketplace for candidates without violating federal law.

128. "[T]his is accomplished," the FEC explained in 2002, "by creating and airing advertisements that avoid the specific language that the Supreme Court said expressly advocates the election or defeat of a candidate." 67 Fed. Reg. 65190 (citing 148 Cong. Rec. at S2140–2141; *Buckley v. Valeo*, 424 U.S. 1, 44 n.52 (1976); 11 CFR 100.22). *See also McConnell v. Federal Election Commission*, 540 U.S. 93, 132 (2003) ("BCRA's central provisions are designed to address Congress' concerns about the increasing use of soft money and issue advertising to influence federal elections.")

129. Congress responded to this issue-advertising loophole in federal corporate campaign finance law with the BCRA, which placed new restrictions on broadcast electioneering communications: "the electioneering communications provisions focus on the key elements of when, how, and to whom a communication is made, rather than relying on the express advocacy test or the intent of the advertiser, they are a clearer, more accurate test of whether an advertisement is campaign-related." 67 Fed. Reg. at 65191.

130. The BCRA's restrictions on broadcast electioneering communications included

prohibitions, disclosure and reporting requirements.

131. Among the new prohibitions found in the BCRA, "[t]hose paying for electioneering communications cannot use funds from national banks, corporations, foreign nationals, or labor organizations to pay for electioneering communications." *Id*. *See also McConnell v. Federal Election Commission*, 540 U.S. 93, 132 (2003) ("Title II [of BCRA] primarily prohibits corporations and labor unions from using general treasury funds for communications that are intended to, or have the effect of, influencing the outcome of federal elections.").

132. Under the BCRA, electioneering communications transmitted by "broadcast, cable, or satellite communications," 67 Fed. Reg. at 65191, "(1) [t]hat refer to a clearly identified Federal candidate; (2) that are transmitted within certain time periods [generally 30 days] before a primary or general election; and (3) that are targeted to the relevant electorate," *id*., could not be funded by corporations. *See also Citizens United v. Federal Elections Commission*, 558 U.S. 310, 320-21 (2010) ("BCRA § 203 amended § 441b [the ban on corporate contributions] to prohibit any 'electioneering communication' as well.").

133. Communications outside the BCRA's 30-day window were not covered by the new prohibitions, nor were any kinds of print communications.

134. Corporations remained free following the enactment of the BCRA to pay for or support communications that did not fall under the new electioneering communication rules, so long as the corporate support for those communications was not barred or restricted by some other statute, rule or regulation.

135. The BCRA did not authorize any form of corporate aid that had prior to 2002 been prohibited by existing campaign finance laws. *See Citizens United v. Federal Election Commission*, 558 U.S. 310, 320 (2010) ("Before the Bipartisan Campaign Reform Act of 2002

29

(BCRA), federal law prohibited—and still does prohibit—corporations and unions from using general treasury funds to make direct contributions to candidates or independent expenditures that expressly advocate the election or defeat of a candidate, through any form of media, in connection with certain qualified federal elections.") (emphasis added).

136.    Coordinated corporate aid remained illegal following the enactment of the BCRA's new restrictions on electioneering communications.

137.    Independent corporate expenditures that expressly advocated the election or defeat of candidates also remained illegal following the BCRA's enactment of the new restrictions on broadcast electioneering communications. *See Buckley v. Valeo*, 424 U.S. 1, 44 & n.52 (1976).

138.    To the extent the BCRA prohibited corporations from funding electioneering communications that identified candidates, the Supreme Court in 2010 in *Citizens United v. Federal Election Commission*, 558 U.S. 310 (2010), invalidated the BCRA's restriction under the First Amendment.

139.    Commensurate with its new restrictions, the BCRA also provided several categorical exemptions from the definition of "electioneering communication."

140.    The reasons behind these categorical exceptions were threefold: either the communication within the exemption (1) was not broadcast, (2) was already sufficiently regulated, or (3) was constitutionally protected under the First Amendment and already exempted from regulation by the existing Federal Election Campaign Act.

141.    The FEC's implementing regulations for the BCRA's categorical exceptions therefore provided an exemption for "communications appearing in print media, including a newspaper or magazine, handbills, brochures, bumper stickers, yard signs, posters, billboards, and other written materials, including mailings; communications over the Internet, including electronic

mail; and telephone communications."  67 Fed. Reg. at 65196 (discussing 11 CFR 100.29(c)(1)).

142.    The BCRA and its implementing regulations also provided a "press exception" for what otherwise might arguably be electioneering communications broadcast by news media.

143.    This press exemption under the BCRA was virtually identical to the one that already was in place for news media under the federal ban on corporate contributions.  *See* Fed. Reg. 65196 (discussing 11 CFR 100.29(c)(2)); FEC Advisory Opinion 2010-08: Film production, distribution costs qualify for press exemption (July 1, 2010) ("The funds a non-stock corporation spends to produce and distribute documentary films that mention federal candidates are covered by the press exemption from the *Federal Election Campaign Act's* (the Act's) definitions of expenditure and electioneering communication.") (italics original).

144.    For expenditures that were already being regulated, the BCRA and its implementing regulations provided an exemption in order to avoid multiple reporting requirements: "The exemption's purpose … is to avoid requiring political committees to report the same expenditures twice."  67 Fed. Reg. 65197 (discussing 11 CFR 100.29(c)(3)).

145.    Because debates were already prohibited outside the FEC's safe harbor, the BCRA and its implementing provisions in 11 CFR 100.29(c)(4) also exempted from the definition of electioneering communication any speech, staging, sponsorship or support that "constitutes a candidate debate or forum conducted pursuant to regulations adopted by the Commission, or which solely promotes such a debate or forum and is made by or on behalf of the person sponsoring the debate or forum."  67 Fed. Reg. 65197 (quoting 11 CFR 100.29(c)(4)).

146.    Debates and communications about lawful debates were exempted from the definition of electioneering communication because "pursuant to the operation of [CFR] §§ 110.13 and § 114.4(f), if the conduct of a debate does not meet the requirements of § 110.13 [the safe harbor],

31

any corporate or labor organization funding for such a debate would constitute a prohibited contribution or expenditure."  67 Fed. Reg. 65198 (emphasis added).

147.    Because debates and communications about debates already were prohibited as unlawful corporate contributions in the absence of equal treatment for all candidates, as required by the safe harbor, the BCRA and its implementing regulations did not consider them to need additional regulation as electioneering communications.

148.    Notwithstanding the enactment of the BCRA in 2002, debate staging and sponsorship by corporations, including non-profit corporations, is still unlawful under federal campaign finance law in the absence of the non-profit debate stager's treating all qualified candidates equally and otherwise satisfying the FEC's safe harbor.

149.    In 2004, faced with the same loophole that Congress discovered and corrected with the BCRA in federal campaign finance laws in 2002, Ohio passed legislation mirroring (in many instances with verbatim language) the new and additional restrictions found in the BCRA. See *Ohio Right to Life Society v. Ohio Elections Commission*, 2008 WL 4186312 (S.D. Ohio 2008) (discussing Ohio's passing of its electioneering communications law).

150.    Ohio's legislation, codified at O.R.C. § 3517.1011,  defined and restricted "electioneering communications" in precisely the same way the BCRA did.

151.    Like federal law, Ohio law after the passage of O.R.C. § 3517.1011continued to prohibit corporations (including non-profits) from making expenditures connected with electioneering communications that identified or targeted candidates.  *See*, *e.g*., O.R.C. § 3517.1011(H) (prohibiting making "any broadcast, cable, or satellite communication that refers to a clearly identified candidate using any contributions received from a corporation or labor organization.").

152.    Like federal law, Ohio law after the passage of O.R.C. § 3517.1011continued to treat

32

coordinated expenditures between corporations and other persons and candidates/parties as in-kind contributions, whether they involved electioneering communications or other kinds of support. *See*, *e.g*., O.R.C. § 3517.1011(G) ("Any coordinated electioneering communication is an in-kind contribution, subject to the applicable contribution limits prescribed in section 3517.102 of the Revised Code, to the candidate by the person making disbursements to pay the direct costs of producing or airing the communication.").

153. Like federal law before it, Ohio's 2004 restrictions on electioneering communications did not authorize corporate contributions to or expenditures for candidates that were already prohibited.

154. Ohio law in 2004 -- like federal law in 2002 -- already prohibited corporations from making contributions to and independent expenditures for candidates that expressly advocated the election of that candidate.

155. Ohio's 2004 electioneering communications law, like the BCRA in 2002, only added restrictions, including disclosure and reporting requirements on broadcast electioneering communications that occurred within 30 days of an election and which otherwise had escaped regulation.

156. Ohio's 2004 electioneering communications law, like the BCRA enacted before it in 2002, expressly exempted from the definition of electioneering communication any activity that (1) was not broadcast, (2) was already sufficiently regulated, or (3) was constitutionally protected under the First Amendment and already exempt from campaign finance regulation.

157. Using the precise same language used by the BCRA, Ohio's 2004 electioneering communications law, O.R.C. § 3517.1011, exempted media activities (because there already was a recognized press exemption), expenditures (because these already were subject to reporting

requirements), and candidate debates (because corporate sponsorship and support were already prohibited in the absence of equal treatment of candidates and proper staging).

158. Like the federal model on which it is based, O.R.C. § 3517.1011 did not repeal existing regulations of and prohibitions on corporate aid through contributions and expenditures.

159. Section 3517.1011(A)(7)(b), like its federal counterpart in the BCRA, exempts from the definition of electioneering communication in language virtually identical to that used by the BCRA and its implementing regulations the following:

> (i) A communication that is publicly disseminated through a means of communication other than a broadcast, cable, or satellite television or radio station. For example, "electioneering communication" does not include communications appearing in print media, including a newspaper or magazine, handbill, brochure, bumper sticker, yard sign, poster, billboard, and other written materials, including mailings; communications over the internet, including electronic mail; or telephone communications.

> (ii) A communication that appears in a news story, commentary, public service announcement, bona fide news programming, or editorial distributed through the facilities of any broadcast, cable, or satellite television or radio station, unless those facilities are owned or controlled by any political party, political committee, or candidate;

> (iii) A communication that constitutes an expenditure or an independent expenditure under section 3517.01 of the Revised Code;

> (iv) A communication that constitutes a candidate debate or forum or that solely promotes a candidate debate or forum and is made by or on behalf of the person sponsoring the debate or forum.

(Emphasis added).

160. As was true of the BCRA's enactment in 2002, Ohio's 2004 exemption for debates from the definition of electioneering communication does not authorize unrestricted corporate sponsorship or staging of candidate debates.

161. Even as late as 2010 after the adoption of O.R.C. § 3517.1001 in 2004 and the Supreme Court's decision in *Citizens United v. Federal Election Commission*, 558 U.S. 310 (2010), the Ohio Elections Commission made it clear that "a corporation will be permitted to independently

34

participate in political activities, <u>as long as such participation is independent and not coordinated with any candidate or political party</u> …."  Ohio Elections Commission Opinion 2010ELC-02, at 1 (September 2, 2010) (emphasis added).

162.    As the Federal Election Commission made clear following its adoption of this same exemption for debates from the definition of electioneering communications in 2002, if the debate did not treat candidates equally, "<u>any corporate or labor organization funding for such a debate would constitute a prohibited contribution or expenditure</u>."  67 Fed. Reg. at 65198 (emphasis added).

163.    Federal tax law at the time the City Club of Cleveland and Marietta College staged their exclusive debates prohibited non-profits, which both were and are, from taking that action.

164.    The Treasury Department and IRS have interpreted the Internal Revenue Code to prohibit tax-exempt charitable organizations from sponsoring or staging "exclusive" candidate debates and forums since at least 1986.

165.    In order for a university, college, civic club, or other tax-exempt organization to sponsor or stage a debate (while maintaining its tax-exempt status), it must "provide[] fair and impartial treatment of candidates, and … not promote or advance one candidate over another …."  U.S. Treasury Department, Rev. Rul. 86-95, 1986-2 C.B. 73.  *See also* U.S. Treasury Department, Rev. Rul. 2007-41 (June 18, 2007) (discussing what tax-exempt organizations may lawfully do for and with candidates).

166.    Federal tax laws prohibit non-profit corporations from staging candidate debates without either inviting all qualified candidates or at least employing neutral pre-existing criteria to select the participants.  *See* John Pomeranz, *et al*., *Tax Exempt Organizations and Political Activity*, 28 No.4 PRAC. TAX LAW. 17, 18 (2014) ("A 501(c)(3) may hold a public forum or debate for

35

candidates to publicize their views on issues <u>so long as all candidates are invited to participate,</u> the forum covers a broad range of issues, and questions do not reflect a preference or bias for one candidate.") (emphasis added); *Fulani v. League of Women Voters Education Fund*, 882 F.2d 621, 629 (2d Cir. 1989) ("we agree that an organization's selective promotion of certain *parties* over others would be inconsistent with its section 501(c)(3) tax-exempt status.").

167.    Because the University of Dayton, the City Club of Cleveland and Marietta College did not treat all qualified candidates equally by employing permissible pre-existing, objective criteria to select the participants in its debate, they could not have been in compliance with federal tax laws or Ohio's ban on corporate contributions to candidates and their campaigns.  *See* Ohio Revised Code § 3599.03(A)(1).

168.    The University of Dayton, the City Club of Cleveland, the Ohio Debate Commission, Cleveland State University, Marietta College, the Cordray Campaign, and the DeWine Campaign knew when they staged the debates that no relevant polling existed in Ohio for the gubernatorial election.

169.    Pursuant to O.R.C.  § 3517.991, Ohio's Administrative Code provides that violations of O.R.C. § 3599.03(A)  are subject to fines levied by the Ohio Elections Commission and ranging from $100 to $5000.  *See* O.A.C. 3517-1-14(B)(3).

170.    Cordray and DeWine are responsible under Ohio's campaign finance laws for the actions and omissions of their campaigns. *See Disciplinary Counsel v. Spicer*, 106 Ohio St. 3d 247, 834 N.E.2d 332, 338 (2005).

171.    Fines are to be assessed separately against the corporation, the candidate's campaign committee, the campaign's treasurer and the candidate.  *See* O.A.C. § 3517-1-14(B)(6).

172.    One factor "[i]n determining the amount of a fine and whether to impose the maximum or minimum penalty allowable" is "[w]hether such actions were knowing or purposeful; …." O.A.C. § 3517-1-14(B)(5)(b).

173.    Violations of Ohio Revised Code §§ 3599.03(A)(1) & (B)(1) are first degree misdemeanors, see O.R.C. § 3599.40, and the Ohio Elections Committee is empowered to refer potential violations of O.R.C. § 3599.03(A) to the appropriate prosecutor, which in this instance is the prosecuting attorney of Franklin County.  *See* O.A.C. § 3517-1-14(C)(2)(a).

174.    The University of Dayton, the City Club of Cleveland, Marietta College, Richard Cordray, Richard Michael DeWine, the Cordray Campaign, and the DeWine Campaign knowingly violated O.R.C. §§ 3599.03(A)(1) & (B)(1).

175.    The Cordray Campaign, Cordray, the DeWine Campaign, and DeWine knowingly accepted corporate campaign contributions from the University of Dayton, the City Club of Cleveland and Marietta College in the form of exclusively staged debates in violation of Ohio law in violation of O.R.C. §§ 3599.03(A)(1) & (B)(1).

176.    The University of Dayton, City Club of Cleveland and Marietta College made illegal corporate campaign contributions to the Cordray Campaign, Cordray, the DeWine Campaign, and DeWine within the meaning of Ohio Revised Code § 3599.03(B)(1).

### **Injuries to the Libertarian Party Caused by the Illegal  Debates**

177.    Plaintiff's continuing existence under Ohio law as a recognized political party depends on its gubernatorial candidate in 2018 or its presidential candidate in 2020 winning at least 3% of the popular vote in Ohio.

178.    Plaintiff's gubernatorial candidate's exclusion from the debates which were illegally staged by the University of Dayton, the City Club of Cleveland, Marietta College, Richard

Cordray, Richard Michael DeWine, the Cordray Campaign, and the DeWine Campaign, injured Plaintiff by reducing Irvine's exposure to voters relative to the exposure awarded to Cordray and DeWine, the Democratic and Republican candidates, respectively.

179. Plaintiff's gubernatorial candidate's exclusion from the debates which were illegally staged by the University of Dayton, the City Club of Cleveland, Marietta College, Richard Cordray, Richard Michael DeWine, the Cordray Campaign, and the DeWine Campaign, diminished the popular support that Irvine received in the 2018 gubernatorial election to the benefit of Cordray and DeWine.

180. Plaintiff's gubernatorial candidate, Travis Irvine, and Plaintiff incurred injuries that are and were causally connected to the University of Dayton, the City Club of Cleveland's, Marietta College's, Richard Cordray's, Richard Michael DeWine's, the Cordray Campaign's, and the DeWine Campaign's, violations of Ohio's ban on unlawful corporate contributions.

181. Plaintiff invested approximately one-quarter million dollars qualifying itself and its gubernatorial candidate, Irvine, for Ohio's 2018 general election.

182. After being qualified for Ohio's ballot in 2018, Plaintiff is afforded two electoral opportunities to meet Ohio's 3% vote-test, the first in 2018 and the second in 2020, in order to remain a ballot-qualified political party in Ohio for another four years.

183. In order to meet Ohio's vote-test, Plaintiff's gubernatorial candidate, Irvine, needed to win 3% of the total vote for Governor, which he did not do.

184. Plaintiff's next opportunity to meet Ohio's vote-test is in 2020, when its presidential candidate must win 3% of Ohio's total vote for President in order for Plaintiff to remain a ballot-qualified political party in Ohio.

185.    Should Plaintiff's presidential candidate not meet the 3% vote-test, Plaintiff will cease to be a ballot-qualified political party under Ohio law.

186.    The University of Dayton's, the City Club of Cleveland's and Marietta College's exclusive debates between the Republican and Democratic gubernatorial candidates without the presence of Plaintiff's gubernatorial candidate assisted the Republican and Democratic candidates and facilitated their winning greater percentages of the vote than they would have won had Plaintiff's candidate been allowed to participate in the debates.

187.    The University of Dayton's, the City Club of Cleveland's and Marietta College's exclusive debates between the Republican and Democratic gubernatorial candidates without the presence of Plaintiff's gubernatorial candidate caused Plaintiff's gubernatorial candidate to win fewer votes than he would have had he been properly allowed to participate.

188.    The University of Dayton's, the City Club of Cleveland's and Marietta College's exclusive debates between the Republican and Democratic gubernatorial candidates without the presence of Plaintiff's gubernatorial candidate contributed to Plaintiff's gubernatorial candidate's not winning at least 3% of the vote for Governor.

189.    The University of Dayton's, the City Club of Cleveland's and Marietta College's exclusive debates between the Republican and Democratic gubernatorial candidates without the presence of Plaintiff's gubernatorial candidate adversely affected Plaintiff's investment of approximately one-quarter million dollars in gaining access to the ballot in 2018.

## The Libertarian Party's Administrative Complaints Lodged with the Commission

190.    On September 24, 2018, Plaintiff filed with the Ohio Elections Commission a proper verified administrative complaint, assigned No. 2018G-026 by the Commission, alleging that the

University of Dayton, Richard Michael DeWine, Richard Cordray, the DeWine Campaign, and the Cordray Campaign together staged an illegal debate under Ohio law.

191. Plaintiff's complaint, No. 2018G-026, alleged that the University of Dayton's staging of this exclusive debate without notifying or inviting Plaintiff's gubernatorial candidate and without at bare minimum employing pre-existing objective criteria to select the debate's participants constituted an illegal corporate campaign contribution to Richard Cordray, Richard Michael DeWine, the Cordray Campaign, and the DeWine Campaign.

192. The University of Dayton submitted no evidence to the Ohio Elections Commission tending to establish that it invited all qualified candidates to its debate, treated all qualified candidates equally in terms of staging its debate, or employed neutral, pre-existing objective criteria to select the debate's participants.

193. The University of Dayton's lone legal argument to the Ohio Elections Commission was that as a matter of law Ohio, by its enactment of O.R.C. § 3517.1011 in 2004 of additional restrictions on electioneering communications, had authorized corporations to stage exclusive, preferential debates favoring the candidates of its choosing free from restrictions that had been in place prior to 2004.

194. On October 9, 2018, Plaintiff filed with Defendant, the Ohio Elections Commission, a proper verified administrative complaint, assigned No. 2018G-031 by the Commission, alleging that the City Club of Cleveland, d/b/a the Ohio Debate Commission, Marietta College, Richard Michael DeWine, Richard Cordray, the DeWine Campaign, and the Cordray Campaign together staged two illegal debates under Ohio law.

195. Plaintiff's complaint, No. 2018G-031, alleged that the City Club of Cleveland, d/b/a the Ohio Debate Commission, and Marietta College's staging of these exclusive debates without

40

notifying or inviting Plaintiff's gubernatorial candidate and without at bare minimum employing pre-existing objective criteria to select the debate's participants constituted illegal corporate campaign contributions to Richard Cordray, Richard Michael DeWine, the Cordray Campaign, and the DeWine Campaign.

196.    Neither the City Club of Cleveland nor Marietta College submitted evidence to the Ohio Elections Commission tending to establish that they notified or invited all qualified candidates to their debates, treated all qualified candidates equally, or employed neutral, pre-existing objective criteria to select the debates' invited participants.

197.    The City Club of Cleveland's and Marietta College's lone legal arguments to the Ohio Elections Commission were that as a matter of law Ohio by its enactment in 2004 of O.R.C. § 3517.1011 of additional restrictions on electioneering communications had authorized corporations to stage exclusive, preferential debates favoring the candidates of their choosing free from restrictions that had been in place prior to 2004.

198.    The Ohio Elections Commission was made aware of all of the relevant facts described in this Complaint and either knew or should have known of the relevant law previously described in this Complaint before holding its hearing on both complaints, Nos. 2018-026 and 2018G-031, December 6, 2018.

199.    The Ohio Elections Commission's legal counsel advised the Commission in writing before December 6, 2018 hearing that the three debates had been illegally coordinated, staged, planned and sponsored under Ohio law and that the administrative defendants had all violated Ohio law.

200.    The Ohio Elections Commission's legal counsel recommended that the Commission find violations of Ohio's campaign finance laws based on the corporate entities and campaigns

41

charged by Plaintiff in Nos. 2018G-026 and 2018G-031.

201. The Ohio Elections Commission's legal counsel is required by Ohio law to make initial decisions about whether probable cause exists to pursue administrative charges and is required by Ohio law to make recommendations as to dispositions of those charges to the Commission.

202. The Ohio Elections Commission routinely follows its legal counsel's advice and recommendations.

203. On December 6, 2018, the Ohio Elections Commission held its administrative hearing to address Plaintiff's two complaints, Nos. 2018G-026 and 2018G-031,which it consolidated into a single proceeding.

204. On December 6, 2018, after approximately forty-five minutes of legal arguments presented orally by Plaintiff's and the administrative respondents' respective lawyers, the Ohio Elections Commission rejected its own legal counsel's recommendation and "[i]n a unanimous vote without discussion," *see* Julie Carr Smyth, *Ohio election panel tosses minor political parties' debate complaint*, ASSOCIATED PRESS, December 6, 2018 (http://www.apnews.com/cyc9411bcle407ebdb0fc2d2f6b2fb8) (last visited Feb. 19, 2019), in a matter of minutes dismissed Plaintiff's two consolidated administrative complaints.

205. Immediately after the Ohio Elections Commission's hearing and vote on December 6, 2018, Defendant-Commissioner A. Scott Norman stated to Julie Carr Smyth, an Associated Press reporter, that "he didn't think the minor parties had the law on their side. Debates featuring only the Democratic and Republican candidates are nothing new in Ohio." *Id*.

206. Plaintiff was formally notified in writing of the Ohio Elections Commission's dismissal of its two administrative complaints, Nos. 2018G-026 and 2018G-031, on February 1, 2019.

**The Commission's Motivation for Not Enforcing Ohio Law**

207. The Ohio Election Commission's disregard of Ohio law, federal tax law, the uncontested facts placed before it, and its own attorney's recommendations, without discussion, evidences its political animus in favor of the two major political parties.

208. The statement to the press by Commissioner Norman that "Democratic and Republican candidates" have always been allowed to hold exclusive debates further evidences political animus in favor of the two major political parties.

209. That six of the seven Ohio Elections Commission's members must be and are members of the two major political parties further evidences the Commission's political animus in favor of the two major political parties.

210. That members of minor and new political parties, including Plaintiff, are precluded by law from holding any of the Commission's seven positions is further evidence that the Commission's decision was motivated by political animus in favor of the two major political parties.

211. The Commission's dismissal of Plaintiff's two administrative complaints, Nos. 2018G-026 and 2018G-031, can only reasonably be understood and explained as reflecting its preference for preferential, exclusive debates between the candidates of the Democratic and Republican Parties.

212. The Ohio Elections Commission's dismissals of Plaintiff's two administrative complaints, Nos. 2018G-026 and 2018G-031, with political animus violates the First and Fourteenth Amendments to the United States Constitution.

213. The Ohio Elections Commission's refusal and/or failure to enforce Ohio's ban on corporate contributions to candidates and their campaigns because of its political animus

43

favoring the two major political parties violates the First and Fourteenth Amendments to the United States Constitution.

214. The Ohio Elections Commission's refusal and/or failure to enforce Ohio's ban on corporate aid to candidates and their campaigns because the two candidates allowed to participate in the debates were the candidates of the Republican and Democratic parties in Ohio violates the First and Fourteenth Amendments to the United States Constitution.

215. The Ohio Elections Commission refused to enforce Ohio's ban on corporate contributions because enforcement would have been against the gubernatorial candidates and campaigns of the Republican and Democratic parties in Ohio.

216. The Ohio Elections Commission's decision not to enforce Ohio's ban on corporate contributions was motivated by a political animus favoring the Republican and Democratic parties and their candidates in Ohio.

**The Libertarian Party's Administrative Appeal to Ohio's Court of Common Pleas**

217. On or about February 14, 2019, Plaintiff filed two separate administrative appeals from the Ohio Elections Commission's dismissals of its two administrative complaints, Nos. 2018G-026 and 2018G-031, under Ohio's administrative procedures law to the Franklin County Court of Common Pleas.

218. The Franklin County Court of Common Pleas assigned Case No. 19CV1375 to the appeal from administrative complaint No. 2018G-026 and Case No. 19CV1376 to the appeal from administrative complaint No. 2018G-031.

219. On February 28, 2019, in order to avoid potential claim preclusion, Plaintiff amended their two actions in the Franklin County Court of Common Pleas to include their federal

44

constitutional claims against the Commission that are now being presented to this Court in this federal action.

220.    On April 19, 2019, in response to the Commission's motions to dismiss based, in part, on lack of jurisdiction, and the Commission's accompanying motions to stay discovery, the Franklin County Court of Common Pleas stayed both proceedings, Nos. 2019G-1375 and 2019G-1376, and directed the parties to file briefs addressing whether Plaintiff's federal constitutional claims could be properly joined under Ohio law with Plaintiff's administrative appeals.

221.    On May 2, 2019, the Franklin County Court of Common Pleas consolidated Plaintiff's two cases, Nos. 19CV1375 and 19CV1376, into a single proceeding, which remained stayed by order of the Franklin County Court of Common Pleas.

222.    The parties in the consolidated proceedings in the Franklin County Court of Common Pleas have fully briefed whether the Franklin County Court of Common Pleas has jurisdiction over the federal claims raised in those consolidated proceedings and whether those federal claims may be joined with an administrative appeal.

223.    The stay ordered by the Franklin County Court of Common Pleas in those consolidated proceedings remains in place at the time of the filing of this Complaint in this Court.

### Injuries Caused to the Libertarian Party by the Commission's Biased Membership and Selective Refusal to Enforce Ohio Law

224.    Ohio's prohibition on membership on the Ohio Elections Commission of members of minor and new political parties violates the First Amendment to the United States Constitution as incorporated through the Fourteenth Amendment to the United States Constitution.  *See Adams v. Governor*, 922 F.3d 166 (3d Cir. 2019) (holding that categorically barring members of non-major political parties from judicial appointment violates First Amendment).

225.    The Ohio Elections Commission's membership was and is fundamentally and inherently biased in favor of the Republican and Democratic Parties and against new and minor political parties in Ohio in violation of the First Amendment and Fourteenth Amendments to the United States Constitution.

226.    The Ohio Elections Commission's restricted membership in violation of the First Amendment and Fourteenth Amendments is a fatal structural restriction that renders the Commission fundamentally unfair and unable to dispense equal justice under the First and Fourteenth Amendments.

227.    The Ohio Elections Commission's political animus favoring the Republican and Democratic parties in Ohio caused it to dismiss Plaintiff's administrative complaint against the debate staging organization, Richard Cordray, Richard Michael DeWine, the Cordray Campaign and the DeWine Campaign.

228.    The Ohio Elections Commission's dismissal of Plaintiff's administrative complaint based on political animus favoring the Democratic and Republican parties was a but-for cause and the proximate cause of Plaintiff's injuries.

229.    Plaintiff's injuries are causally connected to the Ohio Elections Commission's members' political affiliations and their political animus favoring the Democratic and Republican parties.

230.    Plaintiff's injuries will likely be redressed by reversal of the Defendants' decision and an award of appropriate declaratory and injunctive relief.

231.    The Ohio Elections Commission's dismissal of the Plaintiffs' complaints and its disregard of and selective refusal to enforce Ohio law caused direct injury to Plaintiff's First and Fourteenth Amendment rights to be treated fairly and equally without regard to political association.

232. The Ohio Elections Commission's inherent bias and disregard of and selective refusal to enforce Ohio law directly injured Plaintiff and continues to injure Plaintiff by affording to the two major political parties impunity to receive illegal campaign contributions from corporations in order hold selective, preferential debates.

233. The Ohio Elections Commission's inherent bias and disregard of and selective refusal to enforce Ohio law directly injured Plaintiff and continues to injure Plaintiff by affording to the two major political parties a competitive advantage in the electoral marketplace.

234. The Ohio Elections Commission's inherent bias and disregard of and selective refusal to enforce Ohio law directly injured Plaintiff and continues to injure Plaintiff by affording to the two major political parties a competitive advantage that allows them to harvest from Plaintiff votes for Governor that Plaintiff needs in order to maintain its status as a qualified political party in Ohio.

235. Should Plaintiff not obtain 3% of the vote for Governor or President over the course of two separate election cycles it will once again be forced to spend hundreds of thousands of dollars in order to obtain ballot access.

236. Because of its inherent bias, the Ohio Elections Commission's disregard of and selective refusal to enforce Ohio law against the two major political parties, their candidates and corporate sponsors, is likely to recur.

237. Because of its inherent bias, the Ohio Elections Commission's disregard of and selective refusal to enforce Ohio law against the two major political parties, their candidates and corporate sponsors, is capable of repetition yet evading review.

238. Plaintiff has been in the past and will for the foreseeable continue to nominate candidates for state-wide and local elections in Ohio.

47

239.     The Ohio Elections Commission's inherent bias and selective non-enforcement of Ohio law is the but-for and proximate cause of Plaintiff's injuries.

240.     Declaratory and/or injunctive relief from this Court forcing the Ohio Elections Commission to neutrally and equally enforce Ohio law is likely to redress some or all of Plaintiff's injuries caused by the Ohio Elections Commission.

241.     Declaratory and/or injunctive relief from this Court prohibiting Ohio from limiting membership on the Ohio Elections Commission to members of the two major political parties is likely to redress some or all of Plaintiff's injuries caused by the Ohio Elections Commission.

242.     Declaratory or injunctive relief from this Court enjoining Ohio's law precluding members of minor political parties from being members of the Ohio Elections Commission is likely to redress some or all of Plaintiff's injuries caused by the Ohio Elections Commission.

### Claims for Relief

### Count One (Facial and As-Applied First Amendment Challenge to Ohio's Exclusion in O.R.C. § 3517.152 of New- and Minor-Party Candidates Serving on the Ohio Elections Commission)

243.     Plaintiff incorporates all preceding paragraphs into this Count.

244.     Declaratory and injunctive relief are sought to redress the violations alleged in this Count under 42 U.S.C. § 1983 and the First Amendment, both facially and as-applied to Defendants' actions.

245.     Ohio's political-party restrictions on the membership of the Ohio Elections Commission found in O.R.C. § 3517.152 facially and as-applied violate the First Amendment to the United States Constitution, as incorporated through the Fourteenth Amendment to the United States Constitution. *See Adams v. Governor*, 922 F.3d 166 (3d Cir. 2019) (holding that state law restricting official positions to members of two major parties violates First Amendment).

246.    The Ohio Elections Commission's membership is unconstitutionally restricted by O.R.C. § 3517.152 in violation of the First Amendment to the United States Constitution, as incorporated through the Fourteenth Amendment to the United States Constitution.

247.    Because the Ohio Elections Commission's restricted membership violates the First Amendment to the United States Constitution, as incorporated through the Fourteenth Amendment to the United States Constitution, its actions in dismissing Plaintiff's administrative complaints violate the First Amendment to the United States Constitution, as incorporated through the Fourteenth Amendment to the United States Constitution.

248.    Because the Ohio Elections Commission's politically restricted membership violates the First Amendment to the United States Constitution, as incorporated through the Fourteenth Amendment to the United States Constitution, its dismissal of Plaintiff's administrative complaints is an impermissible structural error and is necessarily void.  *See Williams v. Pennsylvania*, 136 S. Ct. 1899 (2016).

249.    The Ohio Elections Commission's politically restricted membership caused it to dismiss Plaintiff's administrative complaints against the gubernatorial candidates and campaigns of the Democratic and Republican Parties in violation of the First Amendment to the United States Constitution, as incorporated through the Fourteenth Amendment to the United States Constitution.

250.    The Ohio Elections Commission's politically restricted membership precluded it from fairly and equally considering  Plaintiff's administrative complaints against the gubernatorial candidates and campaigns of the Democratic and Republican Parties in the First Amendment to the United States Constitution, as incorporated through the Fourteenth Amendment to the United States Constitution.

**Count Two (As-Applied First Amendment Challenge to the
Ohio Elections Commmission's Selective Non-Enforcement
of Ohio's Ban on Corporate Contributions)**

251.    Plaintiff incorporates all preceding paragraphs into this Count.

252.    Declaratory and injunctive relief are sought to redress the violations alleged in this Count under 42 U.S.C. § 1983 and the First Amendment, as applied, to Defendants' actions.

253.    The Ohio Elections Commission was motivated by political animus favoring the Democratic and Republican Parties to dismiss Plaintiff's administrative complaints against the University of Dayton, the City Club of Cleveland, Marrietta College, Richard Cordray, Richard Michael DeWine, the Cordray Campaign, and the DeWine Campaign in violation of the First Amendment to the United States Constitution, as incorporated through the Fourteenth Amendment to the United States Constitution.

254.    The Supreme Court has firmly established that the First Amendment protects against political favoritism: "[t]he basic constitutional requirement reflects the First Amendment's hostility to government action that 'prescribe[s] what shall be orthodox in politics.'" *Heffernan v. City of Paterson*, 136 S. Ct. 1412, 1417 (2016).

255.    According to the Supreme Court in *Heffernan v. City of Paterson*, 136 S. Ct. 1412, 1417 (2016), a person or party cannot be penalized for "support[ing] a particular political candidate."

256.    The Ohio Elections Commission selectively refused to enforce and/or apply Ohio's corporate aid restriction because of its political animus favoring the Democratic and Republican Parties in Ohio in violation of the First Amendment to the United States Constitution, as incorporated through the Fourteenth Amendment to the United States Constitution. *See*, *e.g.*, *Wood v. Kesler*, 323 F.3d 872, 883 (11th Cir. 2003) (recognizing claim for "retaliatory prosecution in violation of the First Amendment"); *Police Department of City of Chicago v.*

*Mosley*, 408 U.S. 92, 96 (1972) ("Selective exclusions from a public forum may not be based on content alone, and may not be justified by reference to content alone.").

257.    The Ohio Elections Commission's selective refusal to enforce and/or apply Ohio's corporate contribution restrictions caused Plaintiff and its gubernatorial candidate injury by not affording to Plaintiff and its gubernatorial candidate the full protections of Ohio law that are afforded to the Democratic and Republican Parties.

**Count Three (Equal Protection Challenge to Ohio
Elections Commission's Selective Non-Enforcement
of Ohio's Ban on Corporate Contributions)**

258.    Plaintiff incorporates all preceding paragraphs into this Count.

259.    Declaratory and injunctive relief are sought to redress the violations alleged in this Count under 42 U.S.C. § 1983.

260.    The Ohio Elections Commission was motivated by political animus favoring the Democratic and Republican Parties to dismiss Plaintiff's administrative complaint against the University of Dayton, the City Club of Cleveland, Marietta College, Richard Cordray, Richard Michael DeWine, the Cordray Campaign, and the DeWine Campaign in violation of the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution.

261.    The Ohio Elections Commission selectively refused to enforce and/or apply Ohio's corporate contribution restrictions because of its political animus favoring the Democratic and Republican Parties in Ohio in violation of the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution.  *See*, *e.g.*, *Hilton v. City of Wheeling*, 209 F.3d 1005, 1007 (7th Cir. 2000); *Estate of Macias v. Ihde*, 219 F.3d 1018, 1028 (9th Cir. 2000); *Del Marcelle v. Brown County*, 680 F.3d 887 (7th Cir. 2012).

51

262. The Ohio Elections Commission's selective refusal to enforce and/or apply Ohio's corporate contribution restrictions caused Plaintiff injury by not affording to Plaintiff and its gubernatorial candidate the full protections of Ohio law that are afforded to the Democratic and Republican Parties.

## Demand for Relief

Plaintiff hereby respectfully demands:

A.      A declaration under 42 U.S.C. §1983 and 28 U.S.C. § 2201 that the Ohio Elections Commission's dismissal of Plaintiff's two administrative complaints violated the First Amendment to the United States Constitution as incorporated through the Fourteenth Amendment to the United States Constitution.

B.      A declaration under 42 U.S.C. §1983 and 28 U.S.C. § 2201 that the Ohio Elections Commission's dismissal of Plaintiff's two administrative complaints violated the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution.

C.      A declaration under 42 U.S.C. §1983 and 28 U.S.C. § 2201 that the Ohio Elections Commission's politically-biased membership restrictions found in O.R.C. § 3517.152 violate the First Amendment to the United States Constitution as incorporated through the Fourteenth Amendment to the United States Constitution.

D.      An injunction under 42 U.S.C. §1983 prohibiting enforcement of Ohio's politically biased membership restrictions in O.R.C. § 3517.152 placed on members of the Ohio Elections Commission;

E.      An injunction directing the Ohio Elections Commission to reconsider Plaintiff's two unconstitutionally dismissed administrative complaints under a properly constituted tribunal using Ohio law without political animus favoring the Democratic and Republican parties;

52

F.     An award of costs and attorney's fees under 42 U.S.C. § 1988(b); and

G.     Any other relief that the Court deems just.


                                    Respectfully submitted,


                                    */s/ Mark R. Brown*


                                    Mark R. Brown (81941)
                                    303 East Broad Street
                                    Columbus, OH 43215
                                    (614) 236-6590
                                    (614) 236-6956 (fax)
                                    mbrown@law.capital.edu

                                    Mark G. Kafantaris (80392)
                                    625 City Park Avenue
                                    Columbus, Ohio 43206
                                    (614) 223-1444
                                    (614) 300-5123 (fax)
                                    mark@kafantaris.com

                                    Attorneys for Plaintiff

## VERIFICATION OF PLAINTIFF
### (pursuant to 28 U.S.C. § 1746(2))

I, Harold Thomas, acting under the authority of the Plaintiff, Libertarian Party of Ohio, verify under the penalty of perjury that the foregoing is true and correct.

Executed on: _June 10, 2019_

Harold Thomas
Chair, Libertarian Party of Ohio