**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION**

| | |
|---|---|
| **LIBERTARIAN PARTY OF OHIO, et al.,** : | |
| : | Case No. 2:19-cv-02501 |
| **Plaintiffs,** : | |
| : | JUDGE ALGENON L. MARBLEY |
| v. : | |
| : | Magistrate Judge Jolson |
| **DEGEE WILHEM, et al.,** : | |
| : | |
| : | |
| **Defendants.** : | |

**OPINION & ORDER**

**I. INTRODUCTION**

This matter is before the Court on three Motions: (1) Defendants' Motion for Summary Judgment; (2) Plaintiffs' Motion for Reconsideration of the Court's Opinion and Order Denying Plaintiffs' Motions for a Preliminary Injunction and for Summary Judgment; and (3) Plaintiffs' Motion for Leave to File a Sur-Reply to Defendants' Motion for Summary Judgment. Docs. 49, 51, 56. The Motions are ripe for review and the Court will resolve each of them without oral argument. For the reasons set forth below, the Court **GRANTS** Defendants' Motion for Summary Judgment [#49], **DENIES** Plaintiffs' Motion for Reconsideration [#51], and **DENIES** Plaintiffs' Motion to File a Sur-Reply [#56].

**II. BACKGROUND**

On September 24, 2018, the Libertarian Party of Ohio and Harold Thomas ("Plaintiffs"), as Party chair, filed complaints with Ohio's Elections Commission asserting that three organization responsible for facilitating gubernatorial debates throughout Ohio in 2018 violated Ohio Revised Code § 3599.03, which governs corporate campaign contributions. Doc. 1 at 39-41. Plaintiffs

1

claimed that these organizations, by staging an exclusive debate between the Democratic and Republican gubernatorial candidates, and by not notifying or inviting Plaintiffs' gubernatorial candidate or employing objective criteria in selecting debate participants, engaged in illegal corporate campaign contributions. *Id.* According to Plaintiffs, the Commission's legal counsel advised the Commission that the debates had been illegally coordinated, staged, planned, and sponsored under Ohio law, and recommended that the Commission find these organizations in violation of the state's campaign finance laws. *Id.* at 41. But Philip Richter, legal counsel to the Commission, denied that he ever made this recommendation. To the contrary, he attests that he recommended that the Commission find no violation. In any case, on December 6, 2018, the Commission dismissed Plaintiffs' administrative complaints, finding no violation had occurred. *Id.* at 42.

On June 15, 2019, Plaintiffs sued the individual Commissioners on Ohio's Elections Commission ("Defendants") in their official capacity for violating Plaintiffs' First and Fourteenth Amendment rights. In Count One, Plaintiffs brought a First Amendment challenge to Ohio Revised Code § 3517.152, which restricts membership on Ohio's Elections Commission to affiliates of the two major political parties. In Counts Two and Three, Plaintiffs alleged that Defendants violated their First and Fourteenth Amendment rights by selectively choosing not to enforce Ohio' campaign finance laws and by dismissing their administrative complaints. The Court, however, dismissed Counts Two and Three after finding Plaintiffs lacked standing to assert those claims. *See* Doc. 29.

On November 25, 2019, the Court held a hearing on Plaintiffs' Motion for a Preliminary Injunction, where Plaintiffs asked the Court to do the following: (1) declare that O.R.C. § 3517.152 violates the First Amendment; (2) prohibit the state of Ohio from enforcing O.R.C. § 3517.152;

2

(3) direct Defendants to vacate their prior dismissal of Plaintiffs' administrative complaints; (4) direct Defendants to refer Plaintiffs' administrative complaints to a neutral decision maker; (5) enjoin Defendants, as currently constructed, from considering administrative complaints brought against or on behalf of minor political candidates; and (6) direct Defendant, as currently constructed, to refer administrative complaints brought against or on behalf of minor political parties or their candidates to neutral decision makers.  On January 13, 2020, the Court issued an Opinion and Order Denying Plaintiffs' Motion for a Preliminary Injunction.  *See* Doc. 50.  In addition, that Opinion and Order Denied Plaintiffs' First and Second Motions for Summary Judgment because the Motions turned on the same legal question presented in the Motion for a Preliminary Injunction.

Now before the Court are three Motions.  First, Defendants move for summary judgment on Plaintiffs' First Amendment challenge to O.R.C. § 3517.152.  Second, Plaintiffs ask the Court to reconsider its Opinion and Order Denying their Motions for a Preliminary Injunction and for Summary Judgment.  Finally, Plaintiffs move for leave to file a sur-reply to Defendants' Motion for Summary Judgment.

### III. STANDARD OF REVIEW

Federal Rule of Civil Procedure 56(a) provides that a court may grant summary judgment if "the movant shows there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  No dispute of material fact exists where the record "taken as a whole could not lead a rational trier of fact to find for the non-moving party." *Matsushita Elec. Indus., Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).  In analyzing a motion for summary judgment, the court must evaluate "whether the evidence presents a sufficient

disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986).

## IV. ANALYSIS

### A. Plaintiffs' Motion for Reconsideration

Plaintiffs ask the Court to reconsider its Opinion and Order Denying their Motions for a Preliminary Injunction and for Summary Judgment. This Court has previously opined on the landscape surrounding motions for reconsideration and expressed how it views them disfavorably:

> As a general principle, motions for reconsideration are looked upon with disfavor unless the moving party demonstrates one of the following: (1) a manifest error of law; (2) newly discoverable evidence which was not previously available to the parties; or (3) intervening change of controlling law. Neither the passage of time, during which the legal landscape did not change, nor a different spin on the same arguments, is a proper basis for a motion for reconsideration. Furthermore, mere dissatisfaction with a Court's ruling is an inappropriate and insufficient ground to support a motion for reconsideration. This doctrine reflects the sound policy that litigation should not be subject to instant replays but rather decided and put to rest.

*Ohio Midland, Inc. v. Proctor*, 2006 WL 3793311, at *2 (S.D. Ohio Nov. 28, 2006) (Marbley, J.) (internal quotations and citations omitted).

Here, Plaintiffs argue that the Court's reliance on *Pirincin v. Board of Elections*, 368 F. Supp. 64 (N.D. Ohio 1973), and *Werme v. Merrill*, 84 F.3d 479 (1st Cir. 1996), for the proposition that O.R.C. § 3517.12 is not discriminatory towards minor political parties, such as the Libertarian Party of Ohio, is misplaced. Plaintiffs contend, among other things, that these cases, and particularly *Pirincin*, are factually dissimilar, outdated, and no longer have precedential value. Notably, Plaintiffs did not address *Werme* in their reply briefing to the Motion for a Preliminary Injunction and allotted only two sentences to address *Pirincin*, despite Defendants relying heavily on both authorities. *See* Plaintiffs' Reply Brief, Doc. 44 at 11 ("*Pirincin v. Board of Elections*, 368 F. Supp. 64 (N.D. Ohio), *aff'd*, 414 U.S. 990 (1973), does not support OEC's argument. The

4

laws challenged there actually allowed members of minor parties to serve on local election boards, a fact expressly noted in the opinion."). Yet, Plaintiffs now cry foul and attempt to use their Motion for Reconsideration as a vehicle to advance eleven pages worth of arguments that should have been raised earlier. A motion for reconsideration, however, is not an opportunity for a do-over. *Aero-Motive Co. v. Great Am. Ins.*, 302 F. Supp. 2d 738, 740 (2003) ("[A] motion for reconsideration may not be used to raise issues that could have been raised in the previous motion[.]"). Moreover, given that neither *Pirincin* nor *Werme* have ever been overturned, the Court properly relied on these cases as persuasive authority.

Alternatively, Plaintiffs suggest that a change in the law warrants reconsideration of their Motions. Namely, Plaintiffs point to the Sixth Circuit's recent decision in *Daunt v. Benson*, 2020 WL 1875175 (6th Cir. 2020), where the court struck down a challenge to the composition of Michigan's Independent Citizens Redistricting Commission. But that opinion only further supports the Court's decision Denying Plaintiffs' Motions for a Preliminary Injunction and for Summary Judgment. As will be discussed below, *Daunt* affirms that the Court used the proper framework to analyze Plaintiffs' First Amendment claim. Accordingly, Plaintiffs' Motion for Reconsideration [#51] is **DENIED**.

### B. Defendants' Motion for Summary Judgment

As a threshold matter, Plaintiffs have moved for leave to file a sur-reply to Defendants' Motion for Summary Judgment. Plaintiffs assert that a sur-reply is necessary to correct Defendants' claim that Eleventh Amendment immunity is coextensive with Article III subject-matter jurisdiction. The Court, however, is fully capable of assessing the state of the law surrounding Eleventh Amendment immunity without the aid of additional briefing. Furthermore, it is unnecessary to reach the issue of sovereign immunity because Count One of Plaintiffs'

5

Complaint raises only a facial challenge to O.R.C. § 3517.152, as opposed to an as-applied challenge seeking retroactive relief. *See Edelman v. Jordan*, 415 U.S. 651, 677 (1974) (holding "a federal court's remedial power, consistent with the Eleventh Amendment, is necessarily limited to prospective injunctive relief"). For these reasons, Plaintiffs' Motion for Leave to File a Sur-Reply [#56] is **DENIED**. With that decided, the Court now turns to Defendants' Motion for Summary Judgment, where they ask the Court to dismiss Plaintiffs' First Amendment challenge to O.R.C. § 3517.152.

In Count One of the Complaint, Plaintiffs allege that O.R.C. § 3517.152, which restricts membership on Ohio's Elections Commission to affiliates of the two major political parties, violates the First Amendment. In relevant part, that statute provides:

> [T]he speaker of the house of representatives and the leader in the senate of the political party of which the speaker is a member shall jointly submit to the governor a list of five persons who are affiliated with that political party. . . . [T]he two legislative leaders in the two houses of the general assembly of the major political party of which the speaker is not a member shall jointly submit to the governor a list of five persons who are affiliated with the major political party of which the speaker is not a member. . . . [T]he governor shall appoint three persons from each list to the commission.
>
> [A]fter the governor appoints these six members, they shall, by a majority vote, appoint to the commission a seventh member, who shall not be affiliated with a political party.

O.R.C. § 3517.152(a)(1). Plaintiffs contend that the Commissions' eligibility criteria is unconstitutional because it restricts membership to affiliates of the two major political parties, without providing a route for minority party affiliates to seek membership. *See* Doc. 1 at 48.

Recently, in *Daunt v. Benson*, 2020 WL 1875175 (6th Cir. Apr. 15, 2020), the Sixth Circuit took up a similar First Amendment challenge to a ballot initiative establishing Michigan's Independent Citizens Redistricting Commission. There, the initiative disqualified from serving on the Commission eight classes of individuals who currently, or in the past six years, had any of the following political ties:

6

(1) A declared candidate for partisan federal, state, or local office;

(2) An elected official to partisan federal, state, or local office;

(3) An officer or member of the governing body of a national, state, or local political party;

(4) A paid consultant or employee of a federal, state, or local elected official or political candidate, or a federal, state, or local political candidate's campaign or of a political action committee;

(5) An employee of the legislature;

(6) Any person who is registered as a lobbyist agent with the Michigan bureau of elections, or any employee of such person;

(7) An unclassified state employee who is exempt from classification in state civil service pursuant to article XI, section 5, except for employees of courts of record, employees of the state institutions of higher education, and persons in the armed forces of the state; or

(8) A parent, stepparent, child, stepchild, or spouse of any individual identified above.

*Id.* at 2. Recognizing that the proper framework through which the constitutionality of the Commission's eligibility criteria should be analyzed was a matter of first impression, the Sixth Circuit looked to the *Anderson-Burdick* test (which this Court used) and the unconstitutional-conditions doctrine, concluding that the Commission's composition withstood scrutiny under both. Following the Sixth Circuit's lead, this Court will analyze Plaintiffs' First Amendment challenge to O.R.C. § 3517.12(a)(1) under both the *Anderson-Burdick* test and the unconstitutional-conditions doctrine.

### 1. Whether the Statute Survives Scrutiny under the *Anderson-Burdick* Test

In *Anderson v. Celebreeze*, 460 U.S. 780, 788-89 (1983), and *Burdick v. Takushi*, 504 U.S. 428, 433-34 (1992), the Supreme Court articulated a flexible framework for testing the validity of state election regulations. Although the cases that the Supreme Court has analyzed under this framework have generally "involved laws that regulate the actual administration of elections, the rationales for applying the *Anderson-Burdick* test—ensuring that the democratic processes are fair and honest and maintain[ing] the integrity of the democratic process—resonate here, too." *Daunt*, 2020 WL 1875175, at *5 (internal quotations and citations omitted). Indeed, at its core, "the *Anderson-Burdick* framework is used for evaluating state election law[s] and a law restricting membership of the body" responsible for governing electoral matters

7

in the state of Ohio "could conceivably be classified as an election law." *Id.* (internal quotations and citation omitted).

Under the *Anderson-Burdick* framework, the level of scrutiny to be applied corresponds with the degree to which a challenged regulation burdens First and Fourteenth Amendment rights. Thus, the Court "must first consider the character and magnitude of the asserted injury to the rights protected by the First and Fourteenth Amendments that the plaintiff seeks to vindicate" and then "evaluate the precise interests put forward by the State as justifications for the burden imposed by its rule." *Anderson*, 460 U.S. at 789. The Supreme Court simplified this inquiry in *Burdick*:

> Under this standard, the rigorousness of our inquiry into the propriety of a state election law depends upon the extent to which a challenged regulation burdens First and Fourteenth Amendment rights. Thus, as we have recognized when those rights are subjected to severe restrictions, the regulation must be narrowly drawn to advance a state interest compelling importance. But when a state election law provision imposes only reasonable, nondiscriminatory restrictions upon the First and Fourteenth Amendment rights of voters, the State's important regulatory interests are generally sufficient to justify restrictions.

504 U.S. at 134 (internal quotations and citations omitted).

Importantly, "[r]egulations falling somewhere in between—i.e., regulations that impose a more-than-minimal but less-than-severe burden—require a flexible analysis, weighing the burden on the plaintiffs against the state's asserted interest and chosen means of pursuing it." *Daunt*, 2020 WL 1875175, at *6 (quoting *Ohio Democratic Party v. Husted*, 834 F.3d 620, 627 (6th Cir. 2016)) (internal quotations omitted). Determining whether the burden is severe or incidental requires examining "content-neutrality and alternate means of access." *Id.* (quoting *Citizens for Legislative Choice v. Miller*, 144 F.3d 916, 920 (6th Cir. 1998)). A law would not be content-neutral, and would impose a severe burden if, for example, it "limit[ed] political participation by an identifiable political group whose members share a particular viewpoint, associational preference, or economic status." *Id.* (quoting *Anderson*, 460 U.S. at 793). In the same vein, a law would impose a severe burden if it left "few alternate means of access to the ballot," "restrict[ing] the availability of political opportunity." *Id.* (quoting *Anderson*, 460 U.S. at 793) (internal quotations omitted).

8

Here, O.R.C. § 3517.152(a)(1) does not impose a severe burden on rights guaranteed by the First Amendment, as the statute is content neutral and does not limit political participation by an identifiable political group. To be sure, O.R.C. § 3517.152(a)(1) does not limit service on Ohio's Elections Commission to members of the Democratic and Republican parties; rather, it limits service to affiliates of the two major political parties in the state of Ohio, without reference to a specific party. While in practice, the statute currently prohibits any person affiliated with a minor political party, such as Ohio's Libertarian Party, from being considered for membership on the Commission, the statute does not foreclose the opportunity for a minor political party to build its base and become one of the two major parties in the state, which would in turn provide an avenue for its members to serve on the Elections Commission. O.R.C. § 3517.152(a)(1), therefore, is a generally applicable, nondiscriminatory regulation providing equality of opportunity. The First Circuit, in *Werme v. Merrill*, upheld an identical scheme in the selection of election inspectors and ballot clerks in the state of New Hampshire. 84 F.3d 479, 484-85 (1st Cir. 1996) ("New Hampshire's regulation is nondiscriminatory, that is, it does not differentiate among Republicans, Democrats and Libertarians. Instead, the regulation conditions the right to appoint election inspectors and ballot clerks on a certain degree of success at the polls. Distinguishing between recognized political parties based on past electoral accomplishment is not per se invidiously discriminatory. So here: the Libertarian Party has exactly the same opportunity to qualify as a source of election inspectors and ballot clerks under New Hampshire law as does any other party. Equality of opportunity exists, and equality of opportunity—not equality of outcomes—is the linchpin of what the Constitution requires in this type of situation."); *see Pirincin v. Bd. of Elections of Cuyahoga Cty.*, 368 F. Supp. 64, 71-72 (N.D. Ohio 1973) ("At the present time the secretary makes appointments to the county boards of elections from the Republican and Democratic parties because these parties are the two that have pulled the highest number of votes for governor. However, Section 3501.06 protects against locking in these two parties. Another political party may recommend persons to fill positions on boards of elections should that third political party amass the highest or the next highest number of votes in the state at the last preceding gubernational election. . . . Thus, the opportunity to have representation on each county board of elections is available to all political parties.").

9

Additionally, the state of Ohio has important regulatory interests sufficient to justify O.R.C. § 3517.152's minimal restrictions. *See Burdick*, 504 U.S. at 434 ("[W]hen a state election law provision imposes only reasonable, nondiscriminatory restrictions upon the First and Fourteenth Amendment rights of voters, the State's important regulatory interests are generally sufficient to justify the restrictions."). Certainly, Ohio has an interest in ensuring that political balance on its Elections Commission protects the fairness of the deliberative process and that judicial and policy-making decisions are well rounded and diversified. Plaintiffs previously conceded this point. *See* Doc. 37 at 16 ("Plaintiffs concede that Ohio, like Delaware, has a legitimate interest in political balance in the context of investigating and adjudicating election disputes."). Further, requiring bipartisanship on an Elections Commission is universally regarded as an effective means of preventing fraud and ensuring honest elections. *See Vinston v. Anton*, 786 F.2d 1023, 1025 (11th Cir. 1996) ("Appellants admit that Alabama constitutionally may, as all States do, so far as we are aware, follow the practice of requiring bipartisanship in the composition of election boards. Such adversary partisan confrontation is universally regarded as an effective means of preventing fraud and ensuring honest elections."). Finally, political balance achieves fairness, consistency, and objectivity. *See Gill v. State of Rhode Island*, 933 F. Supp. 151, 156 (D.R.I. 1996) ("The provisions ensure fairness by providing for a bipartisan board.").

In short, O.R.C. § 3517.152(a)(1) imposes only a reasonable, nondiscriminatory restriction upon the First Amendment rights of minority political parties seeking membership on Ohio's Elections Commission. Moreover, the statute advances the state's important regulatory interests by implementing a checks and balances system between the state's two major political parties, while providing minority parties the same opportunity to seek representation on the Commission should they garner the necessary voter support. For these reasons, O.R.C. § 3517.152(a)(1) survives scrutiny under the *Anderson-Burdick* test.

**2. Whether the Statute Survives Scrutiny under the Unconstitutional-Conditions Doctrine**

The other potential framework through which the Court can evaluate Plaintiffs' First Amendment challenge is the unconstitutional conditions doctrine. This is the framework for which Plaintiffs advocate. *See* Plaintiffs' Response Brief, Doc. 52 at 11 ("Today, political restriction placed on governmental positions are not judged under the right to vote, and are not treated as restrictions on the franchise/electoral process. Rather, they are measured by the unconstitutional conditions doctrine announced and applied in post-1973 cases like *Elrod*, *Branti*, and *Connick*. The critical question is whether government is disregarding political affiliation, as it must, or is using political affiliation as a qualification for employment."). In essence, Plaintiffs argue that O.R.C. § 3517.152(a)(1) improperly subjects members of minor political parties to an adverse employment action due solely to their political affiliation.

In *Elrod v. Burns*, the Supreme Court held that the practice of patronage dismissals—firing government employees due to disloyalty to an incumbent party—violated the First Amendment because these types of dismissals restrict political belief and association. 427 U.S. 347, 372 (1976). Later, in *Branti v. Finkel*, the Court qualified its holding in *Elrod* and instructed that "party affiliation may be an acceptable requirement for some types of employment." 445 U.S. 507, 517 (1980). The Court noted that "if an employee's private political beliefs would interfere with the discharge of his public duties, his First Amendment rights may be required to yield to the State's vital interest in maintaining governmental effectiveness and efficiency." *Id.* The Court thus concluded that the pertinent question "is whether the hiring authority can demonstrate that a party affiliation is an appropriate requirement for the effective performance of the public office involved." *Id.* at 518.

Building upon Supreme Court precedent, the Sixth Circuit in *McCloud v. Testa* identified several categories of employment positions where it would be acceptable *per se* to consider party affiliation. 97 F.3d 1536, 1557 (6th Cir. 1996). One category is particularly relevant here:

> **Category Four:** positions that are part of a group of positions filled by balancing out the political party representation, or that are filled by balancing out selections made by different governmental agents or bodies.

*Id.* The Sixth Circuit provided the following example as an illustration:

> **Category Four**: a gubernationally-appointed Democratic economist placed on a revenue forecasting committee consisting by law of two economists (one Republican and one Democrat) chosen by state legislature, two economists of similar party affiliation chosen by the governor, and one economist of any party chosen by the president of the state's most prominent university.

*Id.* Ohio's Elections Commission appears to fall squarely within this fourth category.

Previously, the Court declined to foreclose Plaintiffs' First Amendment challenge under *McCloud*, finding the Sixth Circuit "did not contemplate a statute such as O.R.C. § 3517.152 that makes affiliation with a minor political party a disqualifying factor." *See* Doc. 29 at 11. In doing so, however, the Court neglected to give proper deference to the Sixth Circuit's charge to construe any ambiguities in favor of governmental defendants. *See McCloud*, 97 F.3d at 1557 ("In connection with using these categories, we note that if there is any ambiguity about whether a particular position falls into any of them (and so also within the *Branti* exception), it is to be construed in favor of the governmental defendants when the position at issue is unclassified or non-merit under state law per the *Rice* canon."). Moreover, O.R.C. § 3517.152 more accurately conditions membership on the Elections Commission on a political party's success at the polls, which is not discriminatory *per se*. *See Werme*, 84 F.3d at 484-85; *Pirincin*, 368 F. Supp. at 71-72.

Finally, the Court is reminded that the ultimate inquiry is whether the state of Ohio can demonstrate that party affiliation is an appropriate requirement for the effective performance of the public office involved. *See Branti*, 445 U.S. at 518. Two reasons support this finding. First, the Elections Commission, like judges, acts in a quasi-judicial capacity. *See* O.A.C. §§ 3517-1-14-(B)(3) & (C) (noting the Commission is authorized to find violations of Ohio's campaign finance laws, assess fines, and refer violations to the local prosecutor). The Sixth Circuit has unequivocally stated that judges are policymakers within the meaning of *Elrod* and *Branti*, and thus, can be appointed based on political considerations. *See Newman v. Voinovich*, 986 F.2d 159, 163 (6th Cir. 1993) ("[J]udges are policymakers because their political beliefs influence and dictate their decisions on important jurisprudential matters. Therefore, we believe

12

that Governor Voinovich's appointment of judges based on political considerations is consistent with *Elrod*, *Branti*, and *Rutan*.") (internal citation omitted); *cf. Adams v. Governor of Delaware*, 922 F.3d 166, 181 (3d Cir. 2019) ("We . . . conclude that state judges do not fall within the policymaking exception because affiliation with a particular political party is not a requirement for the effective performance of the judicial role."). Additionally, the Commission has other explicit policy-making functions, such as the ability to recommend legislation and issue advisory opinions. *See* O.R.C. § 3517.153(D); *Elrod*, 427 U.S. at 368 ("In determining whether an employee occupies a policymaking position, consideration would also be given to whether the employee acts as an adviser or formulates plans for the implementation of broad goals."). Second, as discussed at length above, Ohio has an important interest in ensuring that political balance on its Elections Commission protects the fairness of the deliberative process and that judicial and policy-making decisions are well rounded and diversified. To that end, O.R.C. § 3517.152(a)(1) establishes a bipartisan Commission that has an inherent system of checks and balances. *See Vinston*, 786 F.2d at 1025 (11th Cir. 1996) ("Appellants admit that Alabama constitutionally may, as all States do, so far as we are aware, follow the practice of requiring bipartisanship in the composition of election boards. Such adversary partisan confrontation is universally regarded as an effective means of preventing fraud and ensuring honest elections."); *Gill*, 933 F. Supp. at 156 ("The provisions ensure fairness by providing for a bipartisan board."). Accordingly, O.R.C. § 3517.152(a)(1) withstands scrutiny under the unconstitutional conditions doctrine and Defendants' Motion for Summary Judgment is **GRANTED**.

## V. CONCLUSION

For the reasons stated herein, the Court **GRANTS** Defendants' Motion for Summary Judgment [#49], **DENIES** Plaintiffs' Motion for Reconsideration [#51], and **DENIES** Plaintiffs' Motion to File a Sur-Reply [#56]. Plaintiffs' Complaint is hereby **DISMISSED**.

**IT IS SO ORDERED.**

_____
**ALGENON L. MARBLEY
CHIEF UNITED STATES DISTRICT JUDGE**

**DATED: June 5, 2020**